[No. A036056. First Dist., Div. One. Aug. 15, 1988.]

MARK GLADSTONE, Plaintiff, Cross-defendant and Respondent, v. DAVID HILLEL et al., Defendants, Cross-complainants and Appellants.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portions to be published follows.

COUNSEL

Daniel U. Smith and Kathleen A. Larocque for Defendants, Cross-complainants and Appellants.

Richard S. Miller for Plaintiff, Cross-defendant and Respondent.

OPINION

NEWSOM, J.—This appeal arises from a judgment secured by Mark Gladstone (hereafter Gladstone) against David Hillel, Mark Nhaissi, Master Diamond and Gem Trading, Inc., Master Diamond of California, Master Diamond, and Master Diamond Wholesale, Inc. (hereafter appellants).

Gladstone brought the action against appellants, seeking equitable relief to recover possession of personal property and claiming damages on theories of conversion and fraud. After the parties waived jury trial, the case was tried before the Superior Court for the City and County of San Francisco. The court awarded Gladstone $90,400 in compensatory damages and $100,000 in punitive damages and granted his requested equitable relief. On the cross-complaint, the court found in favor of Hillel and Nhaissi in the amount of $1,000. Appellants appeal from the judgment on the complaint and cross-complaint and the denial of their motion for new trial.

Gladstone is a craftsman of unique, limited edition jewelry. Sold as works of art, the jewelry derives its value from original design and meticulous hand crafting. The documentary record gives us only a few testimonials of its quality. Alan Revere, who directs a large jewelry academy in San Francisco, testified, "I have seen thousands and thousands and thousands of pieces of jewelry. I have never seen anything of this style before seeing Mr. Gladstone's work." Martin Unversaw, who worked briefly for Gladstone, explained, "[t]echnically it is amazing stuff, the kind of stuff you show to other jewelers and they wonder how certain parts of it are done, . . ."

Gladstone's methods of fabricating jewelry are slow, painstaking, and experimental. He insists that the success of the work depends on these labor-intensive methods: "The reason my jewelry looked the way it did was because I didn't take any short cuts and I was not intending to take any short cuts. I was interested in the product being perfect. And I felt that—that whatever the product cost that is what I could sell it for . . . ." Like other jewelry designers, Gladstone makes rubber molds of his successful designs and dedicates them to a limited number of copies. Later pieces of the design, produced from wax shot into the mold, are numbered to indicate the size of the edition and the place in the series, e.g., 3 of 45. Gladstone describes his collection of molds as his "life work." He testified, "[t]he 130 molds I have now reflect 15 years of my life."

Gladstone learned the jeweler's craft from his father, a manufacturer and wholesaler of gold jewelry in the New York diamond district. After working for his father and other jewelers for several years, he settled, at the age of 27, in Aspen, Colorado, where he founded a company known as Gladstone Medici, Ltd. Between 1972 to 1980, his company catered to a small number of wealthy aficionados of artistic jewelry, striving to produce "museum pieces" that could not be compared with anything else in the market. His clients included well-known celebrities Cher, Johnny Mitchell, George Hamilton, and John Denver. One client purchased over three-quarters of a million dollars of jewelry over a period of years; another put a considerable part of his net worth in a single ring.

But after suffering a series of personal crises, Gladstone dissolved his Aspen business in 1980 and moved to Boise, Idaho. There, a gem salesman, Israel Yachdav, introduced him to appellant, David Hillel. Upon viewing a photographic portfolio of his work, Hillel recalled that he "was very impressed." Hillel had recently entered into a business partnership with Mark Nhaissi, the younger brother of a prominent New York diamond merchant, Eli Nhaissi. Gladstone knew Eli Nhaissi's firm, Pan-American Diamonds, as "one of the major movers and shakers in the jewelry industry." At the instigation of Yachdav and Hillel, Mark Nhaissi invited Gladstone to come to New York where he could visit his brother and discuss a business association.

With all expenses paid, Gladstone flew to New York bringing samples of his jewelry and a photographic album. He found Pan-American Diamond to be "the largest, most impressive jewelry operation" he had ever seen; one room was filled with people simply sorting diamonds. The Nhaissi brothers, who saw his designs as a medium through which they could market unusually valuable diamonds and gems, told Gladstone that they were interested in developing a line of original jewelry designs that would be competitive with Tiffany's. But the visit did not yield any firm agreement and Gladstone left New York awaiting a more concrete proposal. Several months later, he received an urgent call from Mark Nhaissi who asked him to come to San Francisco at the latter's expense to discuss a business arrangement. He and Hillel were opening new offices and wanted to associate him in a jewelry manufacturing and marketing enterprise. Flying to San Francisco, Gladstone met with Hillel, Nhaissi, and their colleague, Yachdav. The conversations that followed set the stage for the present lawsuit.

The trial court found that appellants promised Gladstone "backing of one million ($1,000,000.00) dollars which monies would be used to hire jewelers, for advertising, and to secure a showroom, workshop, and other essentials necessary for this venture. . . . [Gladstone], Nhaissi and Hillel agreed to form a corporation with each owning a thirty percent (30%) interest. Israel Yachdav, who had introduced them to Gladstone, was to receive a ten percent (10%) interest in said corporation. The parties agreed that plaintiff was to contribute the use of his molds, tools and equipment. Any profits from the venture were to be divided in accordance with the parties [sic] respective ownership in the enterprise."

Appellants planned to name the new enterprise M. Gladstone and Company, but they did not give Gladstone any written partnership proposal and offered to pay him only the modest salary of $450 a week. Having experienced personal conflicts with his employer in Sun Valley, Gladstone moved to San Francisco with the details of the business arrangement still un-

confirmed. For six weeks he worked in a garage workshop. Then, on July 1, 1981, appellants leased space for a workshop and showroom in the Phelan Building, a major center of the jewelry industry in San Francisco.

Gladstone and appellants soon experienced a series of conflicts. He had expected to hire three experienced jewelers to assist him in the fabrication of jewelry and had counted on a major retailing effort involving a storefront showroom and advertisements in magazines likely to reach wealthy clients. Appellants allowed him only one assistant, failed to advertise, and tried strenuously to keep expenses low, resisting expenditures for tools and personal expenses. They did rent a small office in the Phelan Building for use as a showroom but opposed his plans for suitable interior design. Gladstone, moreover, had thought that he would be in charge of the design and manufacture of jewelry, but Hillel attempted to maintain close supervision over his work, visiting the workshop several times a day.

During this period, Gladstone's molds were kept in a drawer in the workshop and other valuables were stored in Hillel's personal safe in the Phelan Building. The safe contained a box for finished jewelry, a box for work in progress, and a third box for Gladstone's personal belongings. Much of the trial was devoted to an accounting of items stored in this latter box. Gladstone claimed that the box contained (1) an unfinished sapphire ring that he had fabricated in Boise; (2) six to eight unfinished pieces of jewelry that had belonged to his Aspen business, Gladstone Medici, Ltd.; (3) a black jade and diamond ring with an expensive ruby that Gladstone had purchased jointly with a client; (4) approximately $35,000 in pearls and gems belonging to a prospective client; (5) his wife's wedding ring which Gladstone had brought in for repair; (6) three valuable items of jewelry left by clients for repair or sizing; and (7) a number of miscellaneous items, including chains, a serpent necklace, stones, gold, and lapus lazuli.

During a six-month period, Gladstone finished or began fabrication of thirty-six items of jewelry. He estimates that 16 or 17 of the pieces were finished, but appellants count only 7. While he produced most of the jewelry from his existing molds, he devoted much time to the development of new designs and made a number of additional molds. Gladstone claims that he spent long intensive hours of work to achieve this production. Corroborating this account, his assistant, Martin Unversaw, describes him as "a very driven person." Appellants had, however, a very different perception. Depicting Gladstone as a slow, bumbling craftsman, they claim that he produced worthless molds, took five times as long as any typical jeweler to complete a process, and frequently damaged his own work.

Appellants had evidently expected a sustained, efficient production of jewelry incorporating Gladstone's designs. As the months passed, their

expenses mounted but they still lacked a marketable line of products. Despite his lack of experience in jewelry manufacture, Hillel suggested "ways to eliminate time" and demanded that Gladstone work "faster and more efficiently." For his part, Gladstone felt oppressed by daily arguments and by appellants' failure to make the start-up investment necessary to launch the sort of exclusive jewelry operation that he had envisioned. Around the beginning of November, he prepared a handwritten "Outline for Changes in M. Gladstone & Co.," asking, among other things, a salary increase from $450 to $850 a week over a two-year period and a 50 percent share in the profits. Hillel at first pleaded that he could not find time to read the proposal. Then, when Gladstone demanded an answer, he replied that he would have to discuss it with Nhaissi.

On December 16, 1981, Gladstone commuted to work with Hillel and remained in the workshop until 7 p.m. awaiting his ride home. Hillel then told him that he should find other transportation. Arriving home at about 8 p.m., he learned that Nhaissi had phoned and returned the call. Nhaissi then informed him that he and Hillel had decided to dissolve the enterprise. Gladstone immediately drove back to his workshop to recover his molds but discovered that the lock had been changed. With the help of a locksmith, he entered the workshop the next morning and began packing his tools into a large plastic pail. After about a half-hour, he remembered to check the drawer where his molds were kept. They were missing. According to his account, he left the workshop in a "daze," leaving many of his belongings behind but carrying with him a quantity of appellants' tools. From a friend's office in the building, he again called Nhaissi who told him that Hillel had shipped the molds to New York on a plane the previous evening. Appellants later informed him that they were holding all the jewelry stored in Hillel's safe as collateral for payment of alleged debts.

Lacking molds, tools, and a workshop, Gladstone was largely deprived of a livelihood. His struggle to recover his property provides the basis for his claim of damages; it will be analyzed more carefully in our discussion of the damage issues on appeal. But in brief, Gladstone devoted all his energies in the ensuing months to recover his property, trying first to interest law enforcement authorities in his case and then working through his own attorney. Until April he lived from hand to mouth, borrowing from friends and his father. He then secured a credit from a jewelry equipment supplier to equip a new workshop and resumed his craft.

On June 16, 1982, Judge Brown issued a preliminary injunction ordering appellants to return Gladstone's molds, to give him access to his records of past jewelry sales, and to refrain from "disposing of, transferring, impairing the value of, altering, selling, or encumbering" a list of his property in their

possession. But the relief was not fully effective. Later in the year, appellants sold the workshop equipment to another jeweler who took possession of the room. At the time of trial, Gladstone could not find a number of items left in the room, including about 400 cards recording past sales to clients and his library of art and jewelry books. He was never able to locate many items of jewelry, including his wife's wedding ring, that he had stored in Hillel's safe.

After the lockout, appellants continued to employ a jeweler, Louise O'Connor, whom Gladstone had hired. According to Nhaissi, their "intention at the beginning was to complete the [unfinished] jewelry," but they later decided to produce a line of jewelry incorporating Gladstone's designs. O'Connor testified that she completed 25 pieces of jewelry that she gave to Hillel for a trade show. Appellants later retained two other jewelers for similar work before the workshop was finally closed early in 1983. The total quantity of jewelry produced with Gladstone's designs was never clearly established, but the ledger sheets of appellants' jewelry marketing business showed purchase of enough gold to manufacture 75 rings. On cross-examination Nhaissi admitted that he had over 25 rings of Gladstone's design in a safe in New York.

While admitting that he tried to develop a line of jewelry with Gladstone's designs, Hillel insisted that with a few exceptions, he merely asked his jewelers to fabricate pieces with a similar "look." Gladstone sought to prove that the jewelry was derived directly from his molds or from new molds cast from jewelry that he had fabricated. At trial, he and an expert witness, Alan Revere, minutely examined a collection of molds and jewelry manufactured after the lockout. In most cases, they concluded that appellants had made wax models from the original molds and then simplified the designs to make them more suitable for mass production. On cross-examination, Nhaissi appeared to concede that this was their general practice.

. . . . . . . . . . . . . . . . . . .*

As its next assignment of error, appellant contends that the trial court failed to recognize the preemptive effect of federal copyright law by admitting evidence relevant only to copyright infringement and by framing a decree that invaded the sphere of copyright law. ▪ "There is no doubt that artistic jewelry is copyrightable." (*Ronald Litoff, Ltd.* v. *American Exp. Co.* (D.C.N.Y. 1985) 621 F.Supp. 981, 984, fn. deleted; *Trifari, Krussman &*

* See footnote, *ante,* page 977.

*Fishel, Inc.* v. *B. Steinberg-Kaslo Co.* (S.D.N.Y. 1956) 144 F.Supp. 577.) The Copyright Act of 1976 covers "pictorial, graphic, and sculptural works" which are defined to include "three-dimensional works of fine . . . art." (17 U.S.C. §§ 101, 102(a)(5); see also 37 C.F.R. § 202.19(c)(6) (1987).) ■ A copyright confers " ' "the sole right of multiplying copies." ' " (*Herbert Rosenthal Jewelry Corp.* v. *Kalpakian* (9th Cir. 1971) 446 F.2d 738, 741.) With certain limited exceptions, "[a]bsent copying there can be no infringement of copyright." (*Mazer* v. *Stein* (1954) 347 U.S. 201, 218 [98 L.Ed. 630, 642, 74 S.Ct. 460], fn. deleted; see generally 17 U.S.C. § 106.)

■ While federal copyright protection under the 1976 act extends to unpublished works (17 U.S.C. § 104(a)), the right to copyright protection can be preserved after publication only by compliance with the statutory requirements of notice and registration. In the case of jewelry, publication results from the public display of the work with a general offer of sale. (1 Nimmer, The Law of Copyright (1978) § 409 at p. 4-46.) To retain copyright protection of such items offered for sale, the jewelry maker must affix the copyright symbol to the work and file a copyright registration application with the copyright office. (37 C.F.R. § 202.19(c)(5)(1987); 17 U.S.C. § 407(c).)

The record discloses that Gladstone customarily signed, dated, and engraved an encircled "c" on all his works but never filed an application for copyright registration with the copyright office. (See 17 U.S.C. § 408) He might still be able to make a valid registration if the design has not been in the public domain for five years. (17 U.S.C. §§ 408(a), 405(a)(2).) But he could not bring an action for copyright infringement without making the required filing. (17 U.S.C. § 411(a).) And since federal courts have original jurisdiction over actions for copyright infringement, he could not assert copyright infringement in a state court action. (28 U.S.C. § 1338(a); 3 Nimmer, The Law of Copyright, *op. cit. supra*, § 12.01[A].)

Federal preemption of state causes of action asserting rights comparable to copyright is governed by section 301 of the Copyright Act of 1976. The section provides: "On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title." (17 U.S.C. § 301.) Since artistic jewelry comes "within the subject matter of copyright," the issue of federal preemption turns on whether Gladstone has asserted "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright."

In a much quoted passage, Nimmer postulates an "extra element" test to distinguish valid state causes of action from those "equivalent" to copyright claims: "[A] right which is 'equivalent to copyright' is one which is infringed by the mere act of reproduction, performance, distribution or display. . . . If under state law the act of reproduction, performance, distribution or display, . . . will *in itself* infringe the state created right, then such right is preempted. But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie 'within the general scope of copyright' and there is no preemption." (1 Nimmer, The Law of Copyright, *op. cit. supra*, § 1.01[B] at pp. 1-11, 12.) While generally accepting this test, the courts have demanded that the extra element "must be one which changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." (*Mayer v. Josiah Wedgwood & Sons, Ltd.* (S.D.N.Y. 1985) 601 F.Supp. 1523, 1535; *Brignoli v. Balch Hardy and Sheinman, Inc.* (S.D.N.Y. 1986) 645 F.Supp. 1201.)

Under the extra element test, it is clear that federal copyright law does not preempt state causes of action alleging fraud or conversion—the two theories pleaded in the complaint. Fraud involves "the extra element of misrepresentation." (*Brignole v. Balch Hardy and Scheinman, Inc., supra,* 645 F.Supp. 1201, 1205.) Conversion entails the "wrongful possession of the tangible embodiment of a work." (2 Nimmer, The Law of Copyright, *op. cit. supra*, § 8.23, fn. 1 at p. 8-272.9, *Harper & Row Publishers, Inc.* v. *Nation Enterprises* (2d Cir. 1983) 723 F.2d 195, 201, revd. on other grounds in *Harper & Row* v. *Nation Enterprises* (1985) 471 U.S. 539 [85 L.Ed.2d 588, 105 S.Ct. 2218]; *Oddo* v. *Ries* (9th Cir. 1984) 743 F.2d 630, 635.)

On appeal, Gladstone also relies on two provisions in the state unfair competition law. Business and Professions Code section 17200, which broadly condemns "unlawful, unfair or fraudulent business practice," has been construed to prohibit "appropriating the property of another and selling it as one's own." (*Ojala* v. *Bohlin* (1960) 178 Cal.App.2d 292, 301 [2 Cal.Rptr. 919].) In *Donald Frederick Evans* v. *Continental Homes, Inc.,* (11th Cir. 1986) 785 F.2d 897, 914, the court held that a similar Florida statute was not preempted by copyright law because it required the plaintiff to establish the deceptive conduct of "palming off" another's product as one's own and the likelihood of customer confusion. *Gemveto Jewelry Co., Inc.* v. *Jeff Cooper Inc.* (Fed. Cir. 1986) 800 F.2d 256, 259, is to the same effect although the court cautioned that "injunctive relief should be narrowly tailored to fit the specific legal violations" and remanded the case for the revision of the decree.

A second provision of the state unfair competition law, Business and Professions Code section 17300, is directed specifically at the use of anoth-

er's product as a "plug" in a direct molding process.[2] The question of federal preemption of section 17300 was recently considered in *Interpart Corp.* v. *Italia* (Fed. Cir. 1985) 777 F.2d 678. Departing from the "extra element" analysis, the court inquired whether the section " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Id.* at p. 684.) The court observed that the use of another's product as a plug is "substantially less expensive than developing a mold from scratch" and concluded that the statute was directed at a specific unscrupulous business practice and did not generally prohibit copying in a manner that would invade the administration of the copyright law. (*Id.* at p. 684.)[3]

 In considering whether these rights conferred by state law can sustain the judgment, we will first address the propriety of the injunctive relief. The trial court decreed: "(a) Defendants and each of them are enjoined from using the molds and designs of Plaintiff; (b) Defendants are ordered to forthwith destroy all molds, jewelry, sketches, designs and other representations of Plaintiff's work in their possession, and are prohibited from using them for any purpose."

 A court of equity has long-recognized powers to restrain a threatened tort. (Rest.2d Torts, §§ 933-950.) In California, the courts have enjoined a wide range of common law and statutory torts including trademark and trade name infringement, wrongful use of trade secrets, and unfair competition. (7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 69, p. 5292.) These powers have relevance to the present case if we accept the principle that a tortfeasor has a duty to come to the aid of his victim. Under Restatement Second of Torts section 322, the principle is limited to torts involving "bodily harm," but a recent decision has applied it to copyright infringement. In *Taylor* v. *Meirick* (7th Cir. 1983) 712 F.2d 1112, the defendant, who had concededly copied the plaintiff's copyrighted maps, raised the defense of the statute of limitations. The court held, however, that the defendant's failure to take steps to get the maps back from his

[2] Section 17300 provides: "(a) It shall be unlawful for any person to duplicate for the purpose of sale any manufactured item made by another without the permission of that other person using the direct molding process described in subdivision (c). . . . [¶] (c) The direct molding processes subject to this section is [*sic*] any direct molding process in which the original manufactured item was itself used as a plug for the making of the mold which is used to manufacture the duplicate item."

[3] *Appellant argues that respondent is precluded from invoking Business and Professions Code sections 17200 and 17300 on appeal because it did not base its claim for relief on the statutes at trial. The pleadings indeed did not state causes of action based on the statutes although one allegation seems to rely obliquely on the plug molding statute. But despite this deficiency in the pleading, the case was tried in part on the theory of violation of the unfair competition law. In relying on the statutes, respondent has not adopted a new and different theory on appeal.* (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 316, p. 327.)

dealers before they were resold to consumers constituted an independent violation of the Copyright Act occurring within the period of the statute of limitations. "[K]nowing that he had placed infringing copies in the hands of his dealers Meirick could not sit on his hands while they sold them. A tortfeasor has a duty to assist his victim. The initial injury creates a duty of aid and the breach of the duty is an independent tort. See Restatement (Second) of Torts § 322, Comment c (1965). This principle applies to a statutory tort such as copyright infringement." (*Id.* at p. 1117.)

*Taylor* v. *Meirick* is directly applicable to the tort of conversion. Appellants similarly owed to the person they had wronged a duty to avoid further harm to his interest resulting from their wrongful act. This duty required that they take steps to destroy or refrain from using molds and copies of the designs that they had acquired through the use of the property they had converted. A breach of this duty would constitute a separate tort which a court of equity could appropriately enjoin.

When applied to the tort of conversion, the principle that a tortfeasor has a duty to come to the aid of his victim is congruent with other venerable equitable principles. It is a familiar principle of equity jurisprudence, incorporated in Civil Code section 3517, "that no one may profit by his own wrong. The instances of its application are as various nearly as the ways in which property can be wrongfully acquired." (*Brazil* v. *Silva* (1919) 181 Cal. 490, 494 [185 P. 174].) ■ A corollary of the principle is that one who wrongfully acquires property of another holds the property as an involuntary constructive trustee. The constructive trust includes the product of the misappropriated property: "The constructive trust extends to property acquired in exchange for that wrongfully acquired [citation], and includes 'the direct product,' i.e., profit on and enhancement in value of the property traced into the trust. [Citation.]" (*Haskel Engineering & Supply Co.* v. *Hartford Acc. & Indem. Co.* (1978) 78 Cal.App.3d 371, 375 [144 Cal.Rptr. 189]; *Rankin* v. *Satir* (1946) 75 Cal.App.2d 691, 695 [171 P2d 78]; Civ. Code, §§ 2223 and 2224.)

■ We need not, however, rely on the legal fiction of a constructive trust; it suffices that the appellants should not be permitted to benefit from the fruit of their wrongful conversion of Gladstone's property. On this additional basis, we may affirm the decree to the extent that it orders appellants (1) to refrain from using (i) Gladstone's molds or other representations of his designs which they wrongfully acquired or retained possession of or (ii) copies of such molds or other representations of his designs or of his jewelry which were derived from his molds, designs or jewelry while appellants wrongfully retained possession thereof; and (2) to destroy all

molds, jewelry, sketches, designs, and other representations of Gladstone's work that appellants wrongfully acquired or retained possession of.

Similarly, the decree may enjoin the use of respondent's jewelry as a plug in a direct molding process in violation of Business and Professions Code section 17300 or the "palming off" of respondent's designs as appellants' own in violation of Business and Professions Code section 17200. There was evidence tending to prove that several items of jewelry were directly molded from pieces that Gladstone had fabricated. The evidence of "palming off" was slight—a few apparent copies retained his signature—but appellants' conduct displayed a pattern of wrongfully using Gladstone's molds and designs which represented a sufficient threat of violation of Business and Professions Code section 17200 to justify a decree which includes an injunction against future violation of that statute.

Appellants point out, however, that the decree broadly enjoins them "from using the . . . designs of Plaintiff" and prohibits them from using "designs and other representations of Plaintiff's work . . . for any purpose." This language, they insist, gives respondent a right equivalent to copyright—a right to restrain copying of his work. We agree. A line of cases have rejected attempts to enforce rights equivalent to copyright on theories of conversion or unfair competition. (*Gemveto Jewelry Co., Inc.* v. *Jeff Cooper Inc., supra,* 800 F.2d 256, 259; *Ehat* v. *Tanner* (10th Cir. 1986) 780 F.2d 876; *Uncle Jam Records* v. *Warner Bros.,* 1983-84 Copyright Law Decisions ¶ 25,580; *Oakes* v. *Suelynn Corp.* (1972) 24 Cal.App.3d 271, 279 [100 Cal.Rptr. 838].) To avoid this result, the decree must be more closely tailored to the rights conferred by state law.

■ It follows from our discussion that the trial court did not err in admitting evidence that appellants copied Gladstone's molds and jewelry. This evidence, which occupied hundreds of pages of the transcript, was admissible on multiple grounds. In some cases, the testimony was offered to prove violation of Business and Professions Code sections 17200 and 17300. As we will discuss more fully later, it was sometimes also relevant to the claim of punitive damages by tending to prove oppression within the meaning of Civil Code section 3294. But without apparent exception, the evidence tended to show appellants' use of the wrongfully converted molds and jewelry in their possession. Evidence of this use was relevant to appropriate injunctive relief protecting Gladstone from the consequences of appellants' conversion of his molds, jewelry, and other tangible embodiments of his designs.

. . . . . . . . . . . . . . . . . . . . . . . . .*

*Efforts to Recover Property*

Under Civil Code section 3336, damages for conversion of personal property may include "[a] fair compensation for the time and money properly expended in pursuit of the property." Gladstone submitted a tabulation of 1088 hours that he spent in attempting to recover his molds, jewelry, and other property; and valuing his time at $100 an hour, he asked for $108,000 in damages. The trial court accepted Gladstone's valuation of his time at $100 an hour but accepted only a small portion of the claimed expenses as damages. The statement of decision found: "[p]laintiff spent at least ten thousand dollars in his time to recover items of his personal property converted by defendants."[4] Appellants point out that nearly all the items on Gladstone's tabulation had some connection with this litigation and argue that the award was improper because it was based on time and expense incurred in preparation for litigation.

It has long been held that Civil Code section 3336 does not authorize the award of attorney's fees. (*Haines* v. *Parra* (1987) 193 Cal.App.3d 1553, 1558-1559 [239 Cal.Rptr. 178].) As an apparent extension of this rule, the early case of *W. & P. Nicholls* v. *Mapes* (1905) 1 Cal.App. 349, 356 [82 P. 265], disallowed 10 dollars that plaintiff paid " 'in expenses of Charles Tuttle in coming to Dutch Flat to take the depositions.' " More recently, *Security-First National Bank of Los Angeles* v. *Lutz* (9th Cir. 1963) 322 F.2d 348, 352, refused to allow certain accounting expenses paid after the converted property had been successfully traced and identified. The court held "[t]hese expenses, then, were incurred in preparation for litigation and not in pursuit of property."

When Civil Code section 3336 was enacted in 1872, the Legislature may have contemplated compensation for time spent searching the countryside in search of misappropriated livestock or other chattels. But Gladstone could only rely on legal process to recover the property that appellants withheld. The preliminary injunction that he obtained in July 1981, marked only the beginning of his efforts. After returning most of the molds, appellants actively concealed their possession of other property. In a letter dated December 13, 1983, their attorney informed Gladstone that "rings or jewelry left with the company" had been either sold or "melted down and

---

*See footnote, *ante,* page 977.

[4]Appellants also criticize certain specific expenses in Gladstone's tabulation, but since the trial court also rejected most of the claimed expenses, their arguments cannot affect the validity of the award.

disposed of in payment of business bills sometime between December 1981 and June, 1982." Nhaissi had testified to the same effect on deposition. At trial appellants finally produced five missing molds and twenty-one pieces of jewelry manufactured by M. Gladstone & Co. but, despite persistent cross-examination, Gladstone was unable to locate much of the converted property.

Under modern conditions, the legislative purpose of Civil Code section 3336 would be defeated by rigorously excluding all items having some connection with litigation. The statute should at least extend to efforts that had a purpose independent of the litigation, such as preparation of lists of missing property, inspection of inventories, meetings with appellants, contacts with law enforcement authorities, and inquiries regarding appropriate courses of action. The record of these items is sufficient to sustain the relatively modest award of $10,000 at issue here.

*Prejudgment Interest**

. . . . . . . . . . . . . . . . . . . .

The judgment is modified in accordance with this opinion, and as so modified, is affirmed. Costs to respondent.

Racanelli, P. J., and Holmdahl, J., concurred.

---

* See footnote, *ante,* page 977.