1996 SD 120

Gerald SCHULDIES and Carolyn Schuldies, Plaintiffs and Appellees,

v.

Charles MILLAR, Russell Millar, Rosalie Millar, individually and as Trustee of the Lyla May Stephens Johnson Trust and as Guardian of the Lyla May Stephens Johnson Guardianship, Lyla Johnson, individually and as Beneficiary of the Lyla May Stephens Johnson Trust and as Ward of the Lyla May Stephens Johnson Guardianship, LYLA May Stephens Johnson Trust, and Lyla May Stephens Johnson Guardianship, Defendants and Appellants.

Nos. 19269, 19292.

Supreme Court of South Dakota.

Considered on Briefs May 22, 1996.

Decided Sept. 25, 1996.

Rehearing Denied Nov. 1, 1996.

Kenneth E. Barker of Quinn, Eiesland, Day and Barker, Belle Fourche, for plaintiffs and appellees.

Leroy Hill, Belle Fourche, for defendants and appellants.

KONENKAMP, Justice.

[¶ 1] Defendants appeal a jury verdict awarding damages against them for breach of contract, interference with contractual relations, slander and conversion, along with prejudgment interest and punitive damages. We affirm in part, reverse in part and remand.

## FACTS

[¶ 2] Lyla May Johnson owns a 3000 acre cattle ranch spreading across Butte and Lawrence counties. A rancher almost all her life, she moved there when she was twenty-one after marrying her first husband, Bernie Stephens. They had one daughter, Rosalie. After Bernie died, Lyla married Dick Johnson, now deceased, who also ranched with her. At the time of trial Lyla was eighty-years-old and a resident at a nursing home in Broadus, Montana, where her daughter lives. In this suit, her former hired hand, Gerald Schuldies, and his wife, Carolyn, obtained a $123,000 judgment against Lyla, Rosalie Millar, her husband, Charles, and their son, Russell, as well as against Lyla's trust and guardianship estates (collectively defendants).

[¶ 3] Lyla hired Gerald as a ranch hand on February 12, 1979. His wife, Carolyn, lived and worked on the ranch with him. As partial compensation, Gerald received four, two-year-old heifers and their calves for each year of employment. The Schuldies' relationship with Lyla evolved from a pure employment arrangement into a close friendship of over fourteen years. Lyla participated in the Schuldies' family celebrations, outings and holidays and they assumed much responsibility for Lyla's personal needs including driving her to the doctor, to church and to see friends. Lyla publicly acknowledged that much of the credit for the success of the ranch belonged to Gerald and Carolyn as a result of their hard work. When the Schuldies' youngest child was diagnosed with muscular dystrophy, Lyla gave them $5000 to defray medical expenses. She asked them not to tell Rosalie of this gift. This and other circumstances caused the Schuldies to perceive themselves as being closer to Lyla than her own family. Neighbors attested that Lyla saw the Schuldies as successors, running the ranch with a long-term lease.

[¶ 4] Lyla's health declined in 1991. In the latter part of 1992, after a short hospitalization, she was placed in a residential nursing home. The Millars began to suspect the Schuldies had been taking advantage of Lyla's condition. Vested with her mother's power of attorney, on January 7, 1993, Rosalie established the "Lyla May Stephens Johnson Trust," with herself as Trustee and Lyla as Trustor. An inventory of trust assets is not of record, but the corpus apparently envelops most, if not all, of Lyla's holdings, including the ranch real estate, cattle and equipment. Net income from this revocable trust is devoted to Lyla's use and benefit during her lifetime, with the remainder to the corpus. Upon Lyla's death the designated beneficiaries are Rosalie, her husband, and their two sons. On March 30, 1993, Lyla, in her capacity as Trustor, signed a "Letter of Instruction to Trustee," which had been prepared for her at the instance of Rosalie and her family. It stated in part:

> You are further instructed to expedite the termination of the employment of Gerald Schuldies and removal from the ranch of

Gerald Schuldies' family, keeping in mind the removal of all of Schuldies' livestock and equipment, must be done so as not to cause them unnecessary financial loss, but as soon as possible and no later than July 1, 1993.

Disputes arose over the ownership of cattle and equipment, eventually resulting in this lawsuit. Both the Millars and the Schuldies accused each other of exploiting Lyla's weakened condition. The Millars took it a notch further, suggesting to some that Gerald could not be trusted, even calling for a criminal investigation. After the trust was established Rosalie learned that in late 1992 Lyla had instructed her attorney to draw a ten-year ranch lease with the Schuldies. For their part, the Schuldies insisted Lyla wanted to favor them with an advantageous lease in return for their kindness to her over the years. Unfortunately, by the time this matter came to trial Lyla suffered from a hydrocephalic condition resulting in memory loss and confused thinking, so she was unable to remember, much less explain, her intentions.

[¶ 5] The Schuldies asserted several claims, which will be detailed below, but are briefly summarized as follows: (1) breach of contract regarding a purported ten-year lease agreement between the Schuldies and Lyla; (2) tortious interference with this prospective contract; (3) breach of contract over a sale of sixteen broken mouth cows; (4) conversion of cattle and other personal property located on the ranch, including disputes over cattle brands and certain bills of sale; (5) conversion of a $10,000 certificate of deposit Lyla held in joint tenancy with Gerald; (6) slander; and (7) punitive damages. Defendants counterclaimed for conversion, slander, and punitive damages. The jury returned a verdict for the Schuldies.[1]

[¶ 6] We consider the following issues from defendants' appeal:

I. Whether the trial court erred in denying defendants' motions for directed verdict, judgment notwithstanding the verdict, and new trial.

II. Whether the trial court abused its discretion in awarding $1644.50 in photocopy disbursements.

By notice of review Schuldies raise one issue:

III. Whether the trial court erred in denying their request for attorney fees.

## ANALYSIS

### [¶ 7] I. Motions for Directed Verdict, Judgment NOV and New Trial

[¶ 8] Our standard of review on motions for directed verdict and judgment NOV:

A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

A motion for judgment [notwithstanding the verdict] is based on and relates back to a directed verdict motion made at the close of all the evidence. Thus, the grounds asserted in support of the directed verdict motion are brought before the trial court for a second review. We review the testimony and evidence in a light most favorable to the verdict or the nonmoving party,

---

1. The jury allocated the damage award as follows:

| | |
|---|---|
| $68,000 | conversion of personal property |
| $ 5,000 | breach of contract to sell 16 broken mouth cows |
| $10,000 | breach of lease contract |
| $10,000 | tortious interference with contractual relationship |
| $ 1,000 | slander |
| $15,000 | punitive damages |
| $14,000 | prejudgment interest from April 1993–May 1995 on $73,000 of the total damages |
| $123,000 | total |

then without weighing the evidence we must decide if there is evidence which would have supported or did support a verdict.

*Bauman v. Auch,* 539 N.W.2d 320, 325 (S.D. 1995) (citations omitted). We review a trial court's denial of motion for new trial under the following standard:

Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion. If the trial court finds an injustice has been done by the jury's verdict, the remedy lies in granting a new trial. We determine that an abuse of discretion occurred only if no judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion. Finally, we note a decision to grant a new trial stands on firmer footing than a decision to deny a new trial.

*Junge v. Jerzak,* 519 N.W.2d 29, 31 (S.D. 1994) (citations omitted). The Millars cite various trial errors to justify reversal of the trial court's denial of their motions for directed verdict, judgment NOV and new trial.

### [¶ 9] A. Statute of Frauds—Real Property Lease

[¶ 10] On October 22, 1992, Lyla first advised her then attorney, Reed Richards, of her plan to lease the ranch for ten years to the Schuldies. Attorney Richards testified that although the terms of the lease document were close to completion and Lyla wanted to sign it on November 27, 1992, it was not executed due to his concerns over tax and income problems. The Schuldies asserted two claims regarding the ten-year lease: (1) breach of the lease contract itself; and (2) the Millars' tortious interference with the contractual relationship between Lyla and the Schuldies. The jury awarded $10,000 on each claim.

[¶ 11] Defendants unsuccessfully argued that the statute of frauds precludes a claim for breach of lease because Lyla never signed one. SDCL 53–8–2 provides in part:

The following contracts are not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged or his agent, as authorized in writing....

(3) An agreement for sale of real estate or an interest therein, or lease of the same, for a period longer than one year. However, this does not abridge the power of any court to compel specific performance of any agreement for sale of real estate in case of part performance thereof[.]

The Schuldies do not raise the partial performance exception, but instead contend the statute of frauds was satisfied by evidence of an unsigned draft copy of the lease agreement, coupled with Lyla's wish to sign it. SDCL 43–32–5 specifically requires a lease for over one year be *signed* by the lessor:

No agreement for the leasing of real property or an interest therein for a longer period than one year is valid unless the same, or some note or memorandum thereof, be in writing, signed by the lessor or his agent thereunto authorized in writing.

Lyla never signed the lease, although that may have been her intention. The clear mandate of the above statutes impels us to conclude the trial court erred in not granting the motion for directed verdict. We reverse the $10,000 award for breach of lease.

### [¶ 12] B. Contractual Interference

[¶ 13] Defendants believe that without a valid contract there can be no tortious interference with a contractual relationship. They misapprehend the nature of this cause of action. *Lien v. Northwestern Engineering Co.,* 73 S.D. 84, 88, 39 N.W.2d 483, 485–86 (1949)("Liability is not predicated upon the breach of contract, but arises from intentional and wrongful interference with contractual relations."); *see also Tibke v. McDougall,* 479 N.W.2d 898, 908–09 (S.D. 1992)("[T]he interference may consist of injury to either an existing contractual relation or a prospective contractual relation."). The very fact Lyla never entered a lease agreement was the heart of the claim. *See* RESTATEMENT (SECOND) OF TORTS § 766B (1979)("One who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability ...

[when] causing a third person not to enter into or continue the prospective relation . . . .").

[¶ 14] Defendants argue they could not have interfered with the contractual relationship between Lyla and the Schuldies because there was no evidence presented that they knew of any lease negotiations until after discussions had already ended. The exact date negotiations ceased was a fact for the jury to decide. Attorney Richards testified Lyla intended to sign the contract during his last meeting with her on November 27, 1992, but he continued to work on the tax and income consequences of the lease. The Lyla May Stephens Johnson Trust was established on January 7, 1993, approximately five weeks after Lyla's last meeting with her attorney. The jury could infer from the conflicting evidence that negotiations were continuing and would have concluded in a valid lease had the Millars not interfered with Lyla's business relationship with the Schuldies. Viewing the evidence in a light most favorable to the nonmovants and giving them the benefit of all reasonable inferences fairly drawn from the evidence, we find no error in the court's submission of this issue to the jury and the denial of defendants' motions with respect to the Millars. *Haberer v. Rice*, 511 N.W.2d 279, 284 (S.D.1994).

[¶ 15] Nonetheless, the trial court should have granted a directed verdict for Lyla. Even if it is imaginable one can be liable for interfering with one's own prospective contractual relations, the Schuldies never alleged, much less proved, Lyla was legally responsible in any way for interfering with the prospective lease agreement. Nor is there any evidence to support holding Lyla's trust and guardianship estates liable. We reverse the judgment in this regard.

## [¶ 16] *C. Bills of Sale*

[¶ 17] Defendants argue their motions should have been granted on the issue of ownership of certain cattle supposedly transferred by Lyla to the Schuldies. For background purposes, we note the Schuldies acquired cattle from Lyla by different means over the years. First, in 1980, Lyla agreed to provide four heifers for each year of em-

ployment. At trial the parties stipulated that this transfer occurred each year, although formal transfer of title was not always accomplished. Second, Lyla transferred four cows to them as a Christmas bonus on December 29, 1992. Third, an agreement for the sale of sixteen head of broken mouth cattle was also made on December 29, 1992, with payment deferred until November 1993. The Schuldies testified the intent of the parties was that payment for the cows was to be derived from the calf crop from such cows, although they were to bear expenses and risk of loss. Last, an exchange of four of Schuldies' cattle for four of Lyla's was also consummated on December 29, 1992.

[¶ 18] Bills of sale were produced for all the above transactions, except the annual compensation of four heifers. Defendants contend the bills of sale were insufficient to transfer ownership because the Schuldies failed to comply with the requirements of SDCL 40–20–26.2:

> The provisions of § 40–20–26.1 notwithstanding, ownership of livestock with the seller's recorded and healed brand or the owner's unbranded livestock may be transferred by means of an authorized bill of sale without a brand inspection. The bill of sale shall be on a form prescribed by the board. A copy of an authorized bill of sale shall be forwarded to the board or its authorized inspecting agency within five days of such ownership transfer. An authorized bill of sale may transfer no more than five head of livestock to any one buyer. Multiple authorized bills of sale may not be executed to subdivide numbers of livestock greater than five to any one buyer.

They argue the bills of sale the Schuldies used were never mailed to the brand inspection board and the forms were outdated, thus violating the statute and voiding all transfers. Although misdemeanor charges may possibly result if livestock within an "ownership inspection area" (SDCL 40–20–1) are transferred in violation of the law, nothing in our statutory scheme renders the transactions invalid by failing to follow these procedures. *See* SDCL 40–20–26.1; 40–26–2.2. Indeed,

the opposite can be inferred from examining other statutes. *See* SDCL 40–21–10 (lawful title may be established by "other satisfactory evidence of ownership which may include an affidavit of ownership signed by the seller and witnessed by the ownership inspector ...."); SDCL 40–21–11 (seller may be required to establish title "by presenting to the ownership inspector satisfactory evidence of ownership."). Furthermore, Loren Lehmann, a brand inspector for twenty years, opined the bills of sale were sufficient to transfer ownership of the cattle. With signed bills of sale, their validity bolstered by expert testimony and other parol evidence on the parties' intent, clearly there was sufficient evidence to submit the ownership issue to the jury. While there was conflicting testimony regarding ownership of these cattle, it was for the jury to resolve these fact questions. We find no error in denying defendants' motions.

### [¶ 19] D. Certificate of Deposit

[¶ 20] In November 1991, while Gerald was driving Lyla to the hospital, she said, "If something happens to me, ... I have a CD that's held in the bank and it's for you." When she came home three weeks later she showed him a $10,000 certificate of deposit. Neither side offered any bank records to verify the nature of the certificate, but Gerald testified he saw his name on it along with Lyla's, ostensibly as joint tenants. Gerald recalled, "She told me that it was set up by Dick [her second husband] and that [it] was basically an insurance policy that if something ever happened to her or Dick, and it was there." Thereafter she left it in her safe deposit box at Norwest Bank. Although it may have originally been made in contemplation of death, it conceivably transformed into an inter vivos gift when Lyla reaffirmed her donative intent after returning from the hospital. *See* SDCL 43–36–6.

[¶ 21] As Trustee, Rosalie Millar redeemed the CD and spent the proceeds for Lyla's medical care. The Schuldies alleged this was conversion and the jury agreed. "A gift, other than a gift in view of death, cannot be revoked by the giver." SDCL 43–36–3. The essential elements of a gift are intent, delivery and acceptance. *Owen v. Owen,* 351 N.W.2d 139, 142 (S.D.1984). Delivery may be actual or constructive, depending on the circumstances surrounding how the gift was made. *Bunt v. Fairbanks,* 81 S.D. 255, 259, 134 N.W.2d 1, 3 (1965). In *Bunt,* we stated a gift is a contract without consideration and requires delivery to "make it a contract executed." *Id.* at 258, 134 N.W.2d at 2–3. We later explained this holding:

> The fact that the stock certificate was issued in joint tenancy was a key factor in *Bunt.* Thus, even though the husband retained possession of the certificate, we found that he surrendered exclusive possession and control over it when he placed ownership in the daughter and himself. *Id.,* 81 S.D. at 258–259, 134 N.W.2d at 3.
>
> "The delivery of a gift may be either actual or constructive, depending upon the circumstances under which the gift is made." *Id.* 81 S.D. at 259, 134 N.W.2d at 3. *Bunt* affirmed the trial court's finding of a constructive delivery based on the fact that each cotenant has an equal right to possession, that physical possession of the stock certificate could not be maintained by both parties simultaneously, and because the law contemplates that possession by one cotenant is possession for both. *Id.*

*In re* Estate of Fiksdal, 388 N.W.2d 133, 135 (S.D.1986). The trial court instructed the jury that it was to decide whether constructive delivery of the gift was accomplished.

[¶ 22] Joint bank accounts often serve divergent functions, and disputes over their ownership occasionally create "legal and equitable dilemmas." *Rutchick v. Salute,* 288 Minn. 258, 179 N.W.2d 607, 610 (1970) (citations omitted). By giving Gerald joint ownership in the certificate and telling him of her intent, Lyla may have constructively delivered a joint interest to Gerald, but keeping it in her safe deposit box and maintaining her name on it also confirms she had not divested herself of a joint tenancy interest. Can Gerald exact an indefeasible right to the certificate, even against Lyla herself? Neither one had exclusive ownership, as the law contemplates that possession by one cotenant is possession for both. *Bunt,* 81 S.D. at 259, 134 N.W.2d at 3. If Lyla had a right

to redeem the certificate, then Rosalie had an equal right as Lyla's fiduciary. While Gerald repeatedly declares "the Millars" cashed the certificate, the record uncontradictedly establishes the proceeds went for Lyla's nursing home care. Under these circumstances, there can be no conversion, as it would be tantamount to stealing from oneself. *Cf.* SDCL 29A-6-103 (formerly SDCL 30-23-45):

> (1) A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.

The term "account" includes certificates of deposit. SDCL 29A-6-101(1) (formerly SDCL 30-23-43). *But see* Gary D. Spivey, J.D., *Creation of Joint Savings Account or Savings Certificate as Gift to Survivor*, 43 ALR3d 971 (1972)(analyzing cases where a "survivor" asserts a right to a joint account claimed as an inter vivos gift). Gerald cites no authority holding a gift of a joint tenancy interest in a certificate of deposit divests the living joint tenant donor of all rights in the certificate. The trial court erred in not granting a directed verdict or judgment NOV; therefore, we reverse the award and further reduce the judgment by $10,000.

### [¶ 23] *E. Prejudgment Interest*

▉▉▉ [¶ 24] Prejudgment interest is allowed on particular damage awards. *See* SDCL 21-1-13.1.[2] In actions for conversion,

moreover, interest on the value of property converted may be recovered from the date of conversion to the date of trial. SDCL 21-3-3(1); *Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 274 (S.D.1986). Here, the jury awarded interest, pursuant to a special verdict form, from April 1993 to May 1995 on $73,000 of the total damages awarded.[3] As this suit was commenced after July 1, 1990, SDCL 21-1-11 and 21-1-13 were inapplicable. SDCL 21-1-13.2. A prejudgment interest award was legally appropriate. Nevertheless, because portions of the jury verdict are reversed, we remand for a recalculation and adjustment to the correct amount.

### [¶ 25] *F. Conversion*

▉▉▉ [¶ 26] Defendants assail the conversion award because they contend they had no knowledge or intent to convert what belonged to the Schuldies; if the Schuldies had provided adequate proof of ownership, defendants profess they would have immediately relinquished possession of the disputed property. "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion." *Rensch*, 393 N.W.2d at 271.

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither

---

2. SDCL 21-1-13.1 provides:

 Any person who is entitled to recover damages, whether in the principal action or by counterclaim, cross claim or third-party claim, is entitled to recover interest thereon from the day that the loss or damage occurred, except during such time as the debtor is prevented by law, or by act of the creditor, from paying the debt. Prejudgment interest is not recoverable on future damages, punitive damages or intangible damages such as pain and suffering, emotional distress, loss of consortium, injury to credit, reputation or financial standing, loss of enjoyment of life or loss of society and companionship. *If there is a question of fact as to when the loss or damage occurred, prejudgment interest shall commence on the date specified in the verdict or decision and shall run to, and include, the date of the verdict or, if there is no verdict, the date the judgment is entered. If*

*necessary, special interrogatories shall be submitted to the jury.* Prejudgment interest on damages arising from a contract shall be at the contract rate, if so provided in the contract; otherwise, if prejudgment interest is awarded, it shall be at the Category B rate specified in § 54-3-16. The court shall compute and award the interest provided in this section and shall include such interest in the judgment in the same manner as it taxes costs. (Emphasis added).

3. This amount can be logically determined by adding the jury's award for conversion ($68,000) and breach of contract on the sale of the sixteen broken mouth cows ($5,000). The Schuldies have not sought review of why prejudgment interest was not awarded on other items of damage.

knowledge nor ignorance, are of the gist of the action.

*Id.* at 271 (quoting *Poggi v. Scott,* 167 Cal. 372, 375, 139 P. 815, 816 (1914)). We decline to overrule settled law on this question.

[¶ 27] Defendants next maintain the jury award for conversion of personal property was not supported by the evidence because the award exceeded the amount the Schuldies proved or even requested. The jury awarded $68,000, whereas the Schuldies sought $61,965. Computing the amount of an award falls within the sound discretion of the trier of fact. *Kent v. Allied Oil & Supply, Inc.,* 264 N.W.2d 512, 514 (S.D.1978). Damage amounts must be founded in substance, not by argument alone. *Estate of He Crow v. Jensen,* 494 N.W.2d 186, 192 (S.D. 1992).

[¶ 28] The Schuldies account for the excess amount as recompense for miscellaneous personal property. They refer to transcript excerpts for support, but their references only confirm no evidence of value was presented to the jury. "The detriment caused by the wrongful conversion of personal property is presumed to be: (1) The *value* of the property at the time of the conversion...." SDCL 21–3–3 (emphasis added). Jurors cannot be left to guess at value; thus, we find the trial court erred in not granting a judgment NOV to the extent of the excess award. SDCL 15–6–50(b). *See Hulstein v. Meilman Food Indus.,* 293 N.W.2d 889, 891 (S.D.1980)(verdict is excessive when it exceeds actual pecuniary loss). We reverse that portion of the verdict not supported by the evidence and order a reduction of the award by $6,035 ($68,000 less $6,035 = $61,965).

### [¶ 29] *G. Slander*

[¶ 30] The Millars contend there was insufficient evidence to support the slander award of $1000. The applicable law on this issue is too well settled to repeat here. Considering the entire record, the jury obviously found the Schuldies' case more convincing. We find no error in the trial court's denial of the Millars' motions. On the other hand, as there was no evidence to support a slander verdict against the other defendants, the trial court erred in not granting a directed verdict or judgment NOV for Lyla, her trust and her guardianship.

### [¶ 31] *H. Punitive Damages*

[¶ 32] Defendants complain the trial court failed to hold the required evidentiary hearing on the issue of punitive damages pursuant to SDCL 21–1–4.1:

> In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

A trial court's finding that there was a reasonable basis to submit the issue of punitive damages to the jury will not be disturbed absent a showing such finding was clearly erroneous. *Isaac,* 522 N.W.2d 752, 761 (S.D. 1994). There is no absolute requirement for a pretrial hearing. *Brandriet v. Norwest Bank,* 499 N.W.2d 613, 618 (S.D.1993). Before trial, the Schuldies moved for a hearing required under SDCL 21–1–4.1 and requested that it be held in conjunction with their case-in-chief. The trial court agreed and at the close of evidence, found that each side had made a prima facie case for punitive damages and allowed submission of the issue to the jury. Both sides sought punitive damages; both had a fair opportunity to litigate fully the punitive damage issue. We see no error.

[¶ 33] Defendants also argue there was insufficient evidence to justify a punitive damage award. The malice required for an award of punitive damages can be either actual or presumed. *Isaac,* 522 N.W.2d at 761; *Dahl v. Sittner,* 474 N.W.2d 897, 900 (S.D.1991). "A claim for presumed malice can be shown by demonstrating a disregard for the rights of others." *Isaac,* 522 N.W.2d at 761 (citations omitted). With presumed malice there is no requirement that a person act out of hatred or ill-will, but only that the act was conceived in the spirit of mischief or of criminal indifference to civil

obligations. *Dahl,* 474 N.W.2d at 900. Along with slander, refusing to release property rightfully belonging to another may establish the requisite malice. *Id.* The jury found punitive damages appropriate under the facts presented to them. Except with regard to the award against Lyla, her trust and her guardianship, which we reverse, the jury's decision is supported by the evidence and will not be disturbed on appeal.

### [¶ 34] II. Photocopying Expenses

 [¶ 35] Defendants challenge the cost award of twenty-five cents per photocopy. Schuldies claimed 6,578 copies (6578 × .25 = $1,644.50). SDCL 15–17–37 authorizes the award of disbursements to the prevailing party in a civil action, including photocopy costs. We review disbursements under an abuse of discretion standard. *High Plains Genetics Research, Inc. v. JK Mill–Iron Ranch,* 535 N.W.2d 839, 846 (S.D.1995). The Schuldies satisfied the trial court they had indeed incurred the expense of 6,578 copies, many resulting from defendants' discovery requests. The trial court was in the best position to determine the reasonableness of these costs and we find no abuse of discretion in its decision.

### [¶ 36] III. Recovery of Attorney Fees in Conversion Action

 [¶ 37] By notice of review the Schuldies assert the trial court erred in not granting them reasonable attorney fees incurred in this litigation. They cite the statutory remedy for conversion as allowing such award. SDCL 21–3–3 provides in part:

> The detriment caused by the wrongful conversion of personal property is presumed to be . . . .
>
> (3) A fair compensation for the time and money properly expended in pursuit of the property. . . .

As a rule, attorney fees may only be awarded by contract or when explicitly authorized by statute. *O'Connor v. King,* 479 N.W.2d 162, 166 (S.D.1991); *First Bank of South Dakota v. Haberer Dairy & Farm Equip., Inc.,* 412 N.W.2d 866, 874 (S.D.1987); *Ofstad v. S.D. Dep't of Transp.,* 387 N.W.2d 539, 540 (S.D. 1986). In singular circumstances we have allowed attorney fees as damages, though not expressly authorized by statute. *See Colton v. Decker,* 540 N.W.2d 172, 178 (S.D. 1995)(fees incurred before current litigation as incidental damages for breach of warranty under Uniform Commercial Code). *See generally* Dan B. Dobbs, *Law of Remedies* § 3.10(3) (2d Ed 1993)(outlining exceptions to general rule); *but see* John Leubsdorf, *Recovering Attorney Fees as Damages,* 38 RutgersLRev 439 (1986).

[¶ 38] This Court has rigorously followed the rule that authority to assess attorney fees may not be implied, but must rest upon a clear legislative grant of power. *Haberer,* 412 N.W.2d at 874; *Lowe v. Steele Constr. Co.,* 368 N.W.2d 610, 615 (S.D.1985); *City of Aberdeen v. Lutgen,* 273 N.W.2d 183, 185 (S.D.1979). *Cf.* SDCL 15–17–38. We conclude SDCL 21–3–3 is insufficiently specific to allow attorney fees as damages in a conversion action. *See Haines v. Parra,* 193 Cal.App.3d 1553, 239 Cal.Rptr. 178, 181 (1987)(interpreting identical statutory language to hold fees unrecoverable); *but cf. Gladstone v. Hillel,* 203 Cal.App.3d 977, 250 Cal.Rptr. 372, 381 (1988)(recognizing that fees may be allowed if not strictly incurred as part of litigation). If the Legislature disagrees with our interpretation, it possesses a simple remedy. The trial court did not err in denying attorney fees.

### SUMMARY

[¶ 39] We reverse the judgment for breach of lease, the conversion damages exceeding the amount proven by the evidence, the award for conversion of the certificate of deposit and remand for a recalculation of prejudgment interest. We also reverse the judgment against Lyla, her trust and guardianship estates, for interference with contractual relations, slander, and punitive damages. Finally, both sides raise additional issues controlled by settled law, which thus merit no discussion.

[¶ 40] Affirmed in part, reversed in part, and remanded.

[¶ 41] MILLER, C.J., and AMUNDSON and GILBERTSON, JJ., concur.

[¶ 42] SABERS, J., concurs in part and concurs specially in part.

SABERS, Justice, concurring in part, concurring specially in part.

[¶ 43] The majority opinion errs by interpreting *too narrowly* SDCL 21–3–3, which provides in part:

SDCL 21–3–3. **Presumed damages for wrongful conversion of personal property—Presumptions conclusive when possession wrongful from beginning.** The detriment caused by the wrongful conversion of personal property is presumed to be:

. . . . .

(3) A fair compensation for the time and money properly expended in pursuit of the property[.]

[¶ 44] The majority opinion concludes that "SDCL 21–3–3 is insufficiently specific to allow attorney fees as damages in a conversion action." In my view, the language of the statute includes attorney fees as damages as long as they are shown to be "a fair compensation for the time and money properly expended in pursuit of the property." In *Northwestern Pub. Serv. Co. v. City of Aberdeen,* 90 S.D. 627, 244 N.W.2d 544 (1976), this court denied the recovery of attorney fees under SDCL 21–3–3, *not* because they were unavailable under that statute but *only* because the defendants did not have a claim for wrongful conversion. *Id.* at 639, 244 N.W.2d at 550. Our statutes are to be given a liberal construction with a view to effect their objects and to promote justice. SDCL 2–14–12. The problem here was not in the statute, but in the proof. Schuldies never offered any evidence of the attorney fees and expenses incurred in pursuit of the property. In the absence of proof, the trial court had no option except to deny them.[4]

[¶ 45] The majority opinion gives short shrift to the case and treatise authorities it cites. See authorities cited in latter parts of ¶¶ 37 and 38 of the majority opinion. In fact, in *Colton v. Decker,* 540 N.W.2d 172, 178

(S.D.1995), Justice Konenkamp stated in part:

*Attorney Fees*

Colton incurred legal fees in South Dakota attempting to clear the title and retrieve the truck from Wyoming. The trial court allowed these fees as damages under SDCL 57A–2–715. As an element of damages, the attorney's fees were reasonable expenses incident to the impoundment for clouded title. *Kelynack v. Yamaha Motor Corp.,* 152 Mich.App. 105, 394 N.W.2d 17 (1986); *Cady v. Dick Loehr's, Inc.,* 100 Mich.App. 543, 299 N.W.2d 69 (1980).

It is unclear how SDCL 57A–2–715 could be deemed "specific" on the issue of attorney fees (allowing for "expenses reasonably incurred") and SDCL 21–3–3 not specific enough (providing for "a fair compensation for the time and money properly expended in pursuit of the property."). Although *Colton* held that the trial court did not abuse its discretion in denying *other* attorney fees as damages under other UCC provisions, it does not mean attorney fees cannot be awarded as damages in proper cases.

[¶ 46] Even the Leubsdorf treatise referred to by the majority contradicts the position taken in the majority opinion because it supports expansion of attorney fees as damages in proper cases.

[¶ 47] The majority opinion also relies upon *Haines,* 239 Cal.Rptr. at 181 for the California Court of Appeal's holding that attorney fees were unrecoverable under an identical statute. One year later, that court modified its position:

When Civil Code section 3336 was enacted in 1872, the legislature may have contemplated compensation for time spent searching the countryside in search of misappropriated livestock or other chattels. But [the plaintiff in this case] could only rely on legal process to recover the property that [defendants] withheld.

. . . .

---

4. It is interesting to note that the majority's narrow interpretation results in an overbroad conclusion. The decision should simply be that the trial court did not abuse its discretion. To express the holding in language that there is no "authority" to award attorney fees as damages in

conversion cases is surplusage, unnecessary to the actual holding, and therefore dicta. This results in a minor paradox in the majority opinion. An interpretation too narrow, resulting in a holding expressed in language too broad.

Under modern conditions, the legislative purpose of Civil Code section 3336 would be defeated by rigorously excluding all items having some connection with litigation. The statute should at least extend to efforts that had a purpose independent of the litigation, such as preparation of lists of missing property, inspection of inventories, meetings with [defendants], contacts with law enforcement authorities, and inquiries regarding appropriate courses of action. The record of these items is sufficient to sustain the relatively modest award of $10,000 here.

*Gladstone v. Hillel*, 203 Cal.App.3d 977, 250 Cal.Rptr. 372, 381 (1988) (upholding award despite defendants' argument it was improper because it was based on time and expense incurred in preparation for litigation). *Accord Harwood State Bank v. Charon*, 466 N.W.2d 601, 606 (N.D.1991) (agreeing with *Gladstone* but refusing award when attorney submitted unitemized bill).

[¶ 48] Other jurisdictions have also found that "pursuit" expenses recoverable in a conversion action may properly include attorney fees. *See, e.g., Rollins v. Leibold*, 512 P.2d 937, 945 (Alaska 1973) (including attorney fees in a list of costs which flow directly from the conversion); *Motors Ins. Corp. v. Singleton*, 677 S.W.2d 309, 315 (Ky.Ct.App.1984) ("attorney fees incurred in recovering possession of the property [are compensable]."); *Larson v. Van Horn*, 110 Mich.App. 369, 313 N.W.2d 288, 295 (1981) ("[T]he intentional tort of conversion ... is not unlike actions for false imprisonment and malicious prosecution, where the recovery of attorney fees has been allowed."); *Bench Billboard Co. v. City of Columbus*, 63 Ohio App.3d 421, 579 N.E.2d 240, 244 (1989) (noting plaintiffs' attorney fees are properly recoverable as special damages in cases of conversion); *Fulks v. Fulks*, 95 Ohio App. 515, 121 N.E.2d 180, 182 (1953) ("Attorney fees incurred by the plaintiff in the prosecution of this action are not recoverable since the plaintiff is not seeking punitive damages, but attorney fees spent in recovering possession of the [prop-

erty], which is properly pleaded in this case, is a proper item of special damages[.]").

[¶ 49] Some cases hold that only the portion of the attorney fee which is traceable to pursuit of the property is recoverable. *See Cincinnati Ins. Co. v. Diebold, Inc.*, 64 Ohio App.3d 273, 581 N.E.2d 566, 570 (1989) (pointing out *Fulks* was an action to recover *possession* of property and that plaintiffs would be responsible for their own fees in an action to recover *money* damages for wrongful conversion); *Cf. First Nat'l Bank of Santa Fe v. Southwest Yacht & Marine Supply Corp.*, 101 N.M. 431, 684 P.2d 517, 522 (1984) (awarding defendant reasonable attorney fees incurred in quashing a wrongfully issued writ of replevin, but none for otherwise defending the replevin action).

[¶ 50] Therefore, I agree with the majority's affirmance of the trial court's denial of attorney fees as damages in this case because of lack of proof and evidence, but I do not agree with the narrow interpretation of the statute, SDCL 21–3–3.[5]

---

**5.** It should be noted that the Legislature even made "fair compensation for the time and money properly expended in pursuit of the property" a "presumed" damage or "conclusive" presump-

tion which cannot be repelled in favor of one whose possession, as here, was wrongful from the beginning. SDCL 21–3–3.