2004 SD 92

**FIRST PREMIER BANK, as Guardian Ad Litem and Limited Conservator of Daniel L. Boone, Plaintiff and Appellant,**

v.

**KOLCRAFT ENTERPRISES, INC., a Delaware corporation, Defendant and Appellee.**

**Nos. 22421, 22449.**

Supreme Court of South Dakota.

Argued on Oct. 8, 2003.

Decided Aug. 18, 2004.

Michael P. Healy, Kansas City, Missouri, Rollyn H. Samp, Sioux Falls, South Dakota, Jonathan K. Van Patten, Vermillion, South Dakota, Attorneys for plaintiff and appellant.

Mark F. Marshall, Michael L. Luce of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Charles J. Risch of Lawrence, Kamin, Saunders & Uhlenhop, Chicago, Illinois, Attorneys for defendant and appellee.

KONENKAMP, Justice.

[¶ 1.] Litigants are ordinarily prohibited from disclosing to a jury a prior settlement "to prove liability for or invalidity of the claim or its amount." This prohibition, embodied in our rules of evidence, avoids prejudice to all parties and promotes settlements. Here, defense counsel broached the fact of an earlier settlement made on plaintiff's behalf. Although the trial court had advised counsel not to offer evidence about this settlement until he ruled on the pending motion *in limine*, the court took the position that since remarks by attorneys are not evidence, neither side would be precluded from disclosing in their opening statements matters subject to pending motions. Ultimately, the court granted plaintiff's motion *in limine*, ruling that the prejudicial impact of the settlement evidence outweighed its probative value. Yet the court nonetheless found that any prejudice created by the disclosure of the settlement in defense counsel's opening statement did not warrant a new trial. Because, in most instances, a prior settlement should not be disclosed to the jury by any means, the court abused its discretion in allowing counsel to reveal it in remarks to the jury. This error, along with error in the jury instructions, impaired the plaintiff's right to a fair trial. We affirm in part, reverse in part, and remand for a new trial.

**Background**

[¶ 2.] On January 12, 1992, Daniel Boone, age ten months, was severely burned while he was sleeping in a playpen in the children's bedroom at his parents' apartment. Defendant Kolcraft Enterprises manufactured the pads for its "Playard" playpens using two types of polyurethane foam. For customers in California, polyurethane treated with a fire retardant was used, as required by law. For all other customers, non-treated foam was used. After this incident, Kolcraft began using treated foam in all the pads it manufactured.

[¶ 3.] Peggy Boone first sued her landlord for her child's injuries. That matter settled. Plaintiff, First Premier Bank,

was later appointed the child's guardian *ad litem* to pursue further legal action on the child's behalf. Its complaint alleged that the playpen was (1) defective and unreasonably dangerous in its design, or (2) defective and unreasonably dangerous because of a failure to warn. Kolcraft moved for summary judgment before trial and a directed verdict at the close of the evidence, arguing that as a matter of law plaintiff could not prove that Kolcraft's Playard proximately caused Daniel's injuries. The trial court denied both motions.

[¶ 4.] Before trial, both sides sought to exclude certain evidence by motions *in limine*. The judge declined to rule on the motions until the parties were ready to offer evidence during trial. In opening statements, with the court's indulgence, both sides mentioned topics subject to these motions. In other rulings, the court allowed testimony about the smoking habits of Daniel's parents and their non-functioning smoke detector, and permitted the defense to introduce the mother's earlier statement that a blanket was the origin of the fire. The court, however, did not allow plaintiff to introduce evidence that Kolcraft began using fire retardant foam in all its playpen pads after the incident here.

[¶ 5.] After a three-week trial, the jury found against plaintiff. The trial court denied plaintiff's motion for a new trial. On appeal, plaintiff advances manifold assignments of error with multiple subparts. Because not all these issues merit discussion, we address the following: (1) Whether plaintiff is entitled to a new trial because defense counsel disclosed to the jury in his opening statement that the injured child's mother had settled a suit for the same injuries against the family's landlord several years earlier. (2) Whether the trial court abused its discretion in allowing testimony and argument that careless cigarette smoking could not be ruled out as a source of ignition for the fire. (3) Whether the court erred in instructing the jury that it could infer that missing evidence would not have been favorable to plaintiff. (4) Whether the court erred in not giving definitions of "defective condition" in the disjunctive. (5) Whether the trial court erred when it refused to give the jury a limiting instruction on the use of prior inconsistent statements, thus allowing Kolcraft to use the statement as substantive evidence. (6) Whether the trial court erred in excluding evidence of Kolcraft's subsequent remedial measures on the ground that this evidence would "unduly delay" the trial. (7) Whether the trial court erred in allowing Kolcraft to raise the issue of a nonfunctioning smoke detector without proper foundation and to argue what was, in effect, a contributory negligence defense. On notice of review, Kolcraft asserts that the trial court erred when it denied its motion for a directed verdict on the question whether Kolcraft's Playard was the proximate cause of Daniel's injuries.

## I.

### Disclosure of Prior Settlement

[¶ 6.] Plaintiff seeks a new trial because Kolcraft violated an order *in limine* excluding evidence of a prior settlement. During Kolcraft's opening statement, defense counsel advised the jury that plaintiff had settled with the Boone family's former landlord several years earlier. Our standard of review is set forth in *Schuldies v. Millar*, 1996 SD 120, ¶ 8, 555 N.W.2d 90, 95 (citation omitted):

> Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion.... We determine that an abuse of discretion occurred only if no judicial mind, in

view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion.

The abuse of discretion standard also governs a denial of a motion for mistrial based on a violation of an order *in limine. Joseph v. Kerkvliet*, 2002 SD 39, ¶ 7 n. 1, 642 N.W.2d 533, 535 n. 1. To justify a new trial for a violation of such an order, the order must have been specific and the violation clear. *Harter v. Plains Ins. Co., Inc.*, 1998 SD 59, ¶ 31, 579 N.W.2d 625, 633. In addition, the violation must have been prejudicial. *Id.* ¶ 32, 579 N.W.2d 625.

 [¶ 7.] Motions *in limine* are ordinarily heard in advance of trial; they seek a court order requiring parties, attorneys, and witnesses not to disclose "certain facts unless and until permission of the court is first obtained outside the presence and hearing of the jury." *Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 426 (S.D.1994) (quoting *Lapasinskas v. Quick*, 17 Mich.App. 733, 170 N.W.2d 318, 319 (1969). Evidentiary rulings made by a trial court during motions *in limine* are preliminary and may change depending on what actually happens in trial. *Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984). The purpose of the motion "is to prevent prejudicial evidence from reaching the ears of the jury." *Id.* As we noted in *Kjerstad,* when prejudicial matters are brought before the jury, objections or instructions can never entirely remove the harmful effect. Depending on the nature of the motion, a court may delay ruling because of a lack of sufficient facts on which to base a decision or because it is unable to predict the effect of its ruling on the trial. However, if the court reserves its ruling, it must then decide how it is going to handle possible mention of the subject matter during jury selection and opening statements. Once the subject is broached, "the harm is done." *Kjerstad,* 517 N.W.2d at 426 quoting *Lapasinskas,* 170 N.W.2d at 319).

[¶ 8.] Here, before trial, both parties submitted numerous motions *in limine.* During a pretrial motions hearing, the judge set forth his policy concerning rulings on the pending forty-five motions:

I want to tell you about my rulings on these motions *in limine*, and that is that there aren't going to be any rulings.... [I]n order to rule on them I think [I] have got to hear evidence, so I'm not going to rule on them until the time comes. And so before you would present that evidence, you're going to approach me and we'll have a hearing outside of the presence of the jury with the witness on the stand and we'll take whatever evidence we need.... [1]

---

1. After the pretrial hearing, the trial court followed up with a letter to counsel explaining its policy to "reserve rulings on most motions *in limine.*"

Because of the controversy concerning the use of material subject to motions *in limine* by counsel in their opening statements, and the possibility of judicial review, I thought it wise to place my thoughts in writing. These motions almost always call for rulings that are discretionary. A judge cannot operate in a vacuum, and usually must determine relevance after hearing the evidence in question and its relationship to other evidence in the case.... Usually a judge must hear the evidence out of the presence of a jury or receive an offer of proof to make such a decision. (Offers of proof are subject to overstatement, and the opposing attorney generally demands to hear the evidence.)

In a case where many motions exist, the party's case may be severely impaired. A motion could be made against many important pieces of evidence and greatly affect strategy. Most motions relate to evidence that is not so prejudicial as to cause a mistrial....

Attorneys know the rules, know their evidence and must be able to try their cases.

Kolcraft's attorney attempted to clarify the instruction:

> [C]orrect me if my understanding is not accurate—that if any of these issues covered by the motions *in limine* before we make any comments in terms of a question or statement or solicit any type of testimony from a witness, counsel is required and has the obligation, whichever side, to first come up . . . ."

Citing SDCL 15–14–1, the judge responded, "With the exception of the opening statement, and the opening statement is what you intend to prove."[2] There, the confusion began.

[¶ 9.] After vigorous disagreement by Kolcraft's counsel, the judge gave the parties his ruling:

> [I]n this kind of case with all of these motions *in limine*, if I have to rule on the opening statement, that is just intolerable. I'm just not going to blue pencil any opening statement. You lawyers know probably in your heart of hearts what is going to come in and what isn't. All right. And if you get yourself backed in a corner where you admit stuff that is later going to be a mistrial, that's too bad. So be it. I'm not afraid to grant a mistrial. I want you to understand that. And so as far as I'm concerned, *anything you want to say in the opening statement is fine.*

(Emphasis added.) Kolcraft's counsel pressed the issue:

> But again on a lot of these motions *in limine*, virtually all of them, I think to permit any comment about some of these evidentiary matters that are irrelevant and would be . . . extremely preju-

dicial to even comment about, defeats the purposes of the motions *in limine*. And I would again object to any references to any of the areas covered by the motions *in limine* in opening statement.

[¶ 10.] Plaintiff's counsel then entered the debate, "My reading of [SDCL 15–14–1] says that the judge—it basically says you really shouldn't make reference to particular names or exhibits unless the judge lets you." He then attempted to clarify the ruling:

> [J]ust so I'm clear, the defendants have really filed a motion *in limine* on about everything. Some of them—well, we don't think any of them have any merit, to be honest with you, but if I was—I want to make sure that I understand. I can go through in opening statement, I can describe the facts? That's the function of opening statement, as I understand it, so that the jury can anticipate—you know—the flow of evidence, because the evidence might come in in an irregular fashion. And then when we get on to putting on evidence, before any particular witness starts discussing any of the matters that are in the motions *in limine*, we're to come and approach the bench, tell the judge that we anticipate that this witness is going to start talking about.

Kolcraft's counsel again voiced his opposition:

> [T]he whole purpose of our motion *in limine* is not just to prevent the testimony, because you can always object before the witness gives the answer. The whole purpose and fundamental concept

---

If a motion is granted, the evidence subject to it has been mentioned, a determination must be made how to handle the statement. Reminder of the attorney statement rule, a special limiting instruction, or in very rare cases, a mistrial, may be appropriate.

2. SDCL 15–14–1 provides that in opening statements the parties "shall state the issues and the general nature of the evidence . . . without naming or identifying any particular witness or exhibit. . . ."

behind a motion *in limine* is to prevent a comment, the question, or the statement by counsel, because in a lot of issues just talking about it without evidence still plants that in the minds of the jury. And that's the reason for the motions *in limine* .... [A]nd to permit comment on motions *in limine* that are pending is prejudicial and improper, inconsistent with the rule.

[¶ 11.] The judge responded, "I thought [plaintiff's counsel] stated after opening statements are done and before you call any witness that has a motion *in limine*, we're going to have a hearing outside of the presence of the jury." To which plaintiff's counsel replied:

That is my understanding. But, judge, as far as opening statement goes—I mean, I guess, in opening statement—you know—I'm trying to recall the specific motions, some that they have filed—but opening statement is not evidence. The judge instructs the jury that the statements of counsel are not evidence. We all know that if we make promises in opening statement that are not fulfilled in the evidence, that that will turn around and bite us at closing—at the time of closing argument. But here is the concern that I have: as I said, the defendants have filed a motion *in limine* on about everything. If I was to strictly stay away from everything they have talked about, they will have effectively eviscerated my opening statement.... And I don't think that is what opening statement is about. It's not evidence. We can come here and we ought to be able to talk.... And so I want to—I think the correct approach is let the parties make their opening statements, stay within the boundaries of the statute as far as references to names and exhibits, then when it comes to evidence, before any actual evidence is put on, we approach the bench, we say that

this is a topic that is arguably covered by a motion and address it at that point in time. I don't see any other way to have the procedure occur other than just both parties waving opening statement, which I think would be a great disadvantage and disservice to the jury. And I think that's the law.

Finally, Kolcraft's attorney restated his opposition, summed up the judge's order, and tried to explain the problem as he saw it:

To permit—again, the whole fundamental concept, to permit counsel—and that's what he wants to do and he's making it very clear by this argument—is he wants to be able to comment on things to the jury that may not be admissible evidence. And again, the motions *in limine*, just like questions of counsel, are not evidence. It's the testimony that is evidence. He wants to be able to introduce things for the jury to hear about that may not be admissible in evidence, and unless the court is willing to rule on the motions *in limine* prior to opening statement, the only way that it can be done with any record protection and any satisfactory result for either side, is for the attorneys in opening statements to follow the rule, and also with relationship to all of the motions *in limine*, not comment on those items that are covered by the motions *in limine*. The alternative is, [plaintiff's counsel] is going to comment on things that are very—for the reasons we'll urge on our motions *in limine*—are significant issues that need to be addressed, that we do not believe it's proper evidence, and to get the jury to hear that, where the evidence has not been ruled on, is improper. It puts me in a horrible position of: do I stay quiet, or do I have to respond in turn just so that the jury hears both sides of these issues relating

to evidence that we do not believe will be admissible? And again, it defeats the whole purposes of motions *in limine* to permit counsel to comment on it.

[¶ 12.] After plaintiff's opening statement, Kolcraft moved for a mistrial because plaintiff's counsel disclosed matters covered in pending motions *in limine*.[3] In denying Kolcraft's motion, the trial court reasoned:

> What the attorneys say is not evidence. I already instructed.... I will give wide latitude to both sides on final argument, that you know they stated they were going to show this on the opening statements. They didn't show it, so you can take that into consideration, and I will give any special instruction in that respect that anybody requests that fits within the law....

At the close of Kolcraft's opening statement, counsel stated:

> You'll hear testimony that the fire occurred on January 12 of '92 and in 1995, Mrs. Boone, on behalf of her child, sued the landlord for those injuries and damages and settled that case with the landlord and two years later after doing that in late 1997, nearly six years after this fire occurred....[4]

[¶ 13.] Plaintiff now contends that the judge's order "specifically directed counsel not to mention the settlement until a definitive ruling." We need not tarry for long on this point. True, the court prohibited counsel from offering evidence on matters not yet ruled on. But the court made an exception for opening statements, leaving the field open for the attorneys to comment on whatever they chose. At best, the court's ruling was equivocal; at worst, it was an open invitation to disclose "anything" to the jury. Therefore, in that the order was inexplicit, we cannot say that the prohibition was clear. In fact, it was Kolcraft's counsel who argued most vigorously for a prohibition on commenting on matters subject to pending *in limine* motions. As one of Kolcraft's attorneys explained at oral argument, they "pleaded" with the judge to make a ruling on the motions. Regardless of the soundness of its reasoning, the court simply did not prohibit Kolcraft's counsel from mentioning the prior settlement during his opening statement. Nonetheless, having concluded that Kolcraft did not violate an *in limine* order, we believe it is necessary to examine the court's decision to defer ruling on all motions *in limine*, effectively allowing disclosure of the settlement. Before we can reach this more consequential issue, however, we must first address whether plaintiff sufficiently preserved a record for appeal.

[¶ 14.] Kolcraft's attorney contends that plaintiff should be estopped from proceeding on this issue because plaintiff invited the error. It was plaintiff's counsel who argued that he should be allowed to bring up matters in opening statement that remained to be decided. Yet, plaintiff's counsel, like defense counsel, faced a *fait accompli* with the court's ruling that it would not decide *in limine* motions before the actual time for introduction of evidence. And it was the trial

---

3. Kolcraft complained, among other things, that plaintiff had mentioned the California standard in violation of the *in limine* order. However, the court had specifically allowed plaintiff to discuss this standard in opening statement. As it turned out, the court later ruled in favor of plaintiff on allowing into evidence the California standard and some other crucial evidence Kolcraft sought to keep out with its motions *in limine*.

4. It is perhaps more than ironic to observe that Kolcraft's counsel had also earlier moved *in limine* to preclude mention of this settlement.

judge who first announced that the attorneys could divulge matters in opening statements that were awaiting the court's later ruling. Plaintiff's counsel feared making an opening statement "eviscerated" of content if he could not mention any subject covered by all the pending *in limine* motions. We think that with the trial court's policy, counsel faced a dilemma for which he should not now be punished in having chosen the least of two untenable solutions. The issue was not waived by estoppel.

[¶ 15.] Whether plaintiff properly objected is a more troublesome question. Plaintiff did not expressly frame any "objection." The record reflects that when Kolcraft's attorney disclosed the prior settlement to the jury, plaintiff's counsel approached the bench and asked to make a record. Outside the presence of the jury, plaintiff's counsel then protested that the court's *in limine* order had been violated and asked that Kolcraft be sanctioned. We have already resolved that there was no violation. Plaintiff did not ask for a mistrial. In denying the request for a sanction, the court again reiterated its position that what counsel broached to the jury was not evidence and would not be precluded.

[¶ 16.] Alert practitioners must remain conscious to the danger of failing to make an adequate record at trial when a motion *in limine* has been earlier granted or denied. *Cf. Joseph v. Kerkvliet*, 2002 SD 39, ¶ 7, 642 N.W.2d 533, 535 (advising that when a motion *in limine* has been sustained an offer of proof

should be made at trial to make sure that appeal rights are preserved). We have adhered consistently to the precept that, in the absence of an objection or an offer of proof during trial to the admission or refusal to admit challenged evidence, an appeal from a ruling on a motion *in limine* is waived. *Id.* The rationale for requiring either an objection or an offer of proof is to permit trial judges an opportunity to reconsider *in limine* rulings with the benefit of having observed unfolding trial events. *See Luce*, 469 U.S. at 41–42, 105 S.Ct. at 463.

[¶ 17.] A more anomalous problem arises here, however, in a situation where the court neither granted nor denied the motions, but nonetheless permitted counsel unrestricted disclosure of injurious material.[5] We have warned often enough that arguments not raised in circuit court cannot be asserted for the first time on appeal. But here the issue was thoroughly argued below, and even if a proper objection was not made, the court made a deliberate decision to defer its rulings and allow these comments.

[¶ 18.] We think this is one of those rare instances for invoking the plain error doctrine in a civil appeal. *Cf. Wuest ex rel. Carver v. McKennan Hosp.*, 2000 SD 151, ¶¶ 35–36, 619 N.W.2d 682, 691. What value does an *in limine* motion have if, while postponing a decision, the court permits highly prejudicial information to be disclosed to the jury? Although plain error is more often invoked in criminal cases, our rules also allow for its use in civil cases. SDCL 19–9–6 (Rule 103(d)).[6]

---

**5.** There are instances where, with proper protections, a court may wish to defer certain motions *in limine* until the question is framed by the "actual—instead of hypothetical—circumstances at trial." *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5thCir.1980). On the other hand, the purpose of pretrial motions is to

avoid cluttering up the trial with repeated delays for hearings and arguments outside the presence of the jury.

**6.** SDCL 19–9–6 (Rule 103(d)) provides that "[n]othing in this rule precludes taking notice of plain error affecting substantial rights al-

Granted, this Court has written that the plain error rule applies only to criminal procedure and is inapplicable in civil cases. *Mayrose v. Fendrich*, 347 N.W.2d 585, 586 (S.D.1984). For authority, however, the *Mayrose* Court only referred to the criminal counterpart to the civil plain error rule and omitted citing SDCL 19–9–6 (Rule 103(d)). As South Dakota's Professor Larson argues, "this position is in conflict with the Court's own rule, and a refusal to correct even blatant error in a civil case is contrary to the overall sprit of the rules, as expressed in SDCL 19–9–2 (Rule 102), that 'truth may be ascertained and proceedings justly determined.'" John W. Larson, South Dakota Evidence § 103.10[2] (Michie 1991). *Mayrose* is overruled on this point.

[¶ 19.] Under the plain error rule, those claiming error bear the burden of showing that the error was prejudicial. *State v. Nelson*, 1998 SD 124, ¶ 8, 587 N.W.2d 439, 443 (citation omitted). *Nelson* was a criminal case, but the process for examining plain error is the same. "Plain error" requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* We invoke the plain error rule in criminal cases only in "exceptional circumstances." *Id.* Because life and liberty are not at stake in civil tort actions, we will invoke the rule even more cautiously in such cases. Nonetheless, "while the doctrine may be rarely applied even where recognized, to say 'never' may well invite ridicule of the entire judicial system due to a ludicrous result in a given case." Larson, South Dakota Evidence § 103.10[2]. We think such a circumstance exists here. A process that allows unrestricted disclosure

to a jury of prohibited matters seriously affects the fairness, integrity, and public reputation of judicial proceedings.

[¶ 20.] We turn to the question whether allowing mention of the previous settlement warrants a new trial. In *Degen v. Bayman*, 86 S.D. 598, 607, 200 N.W.2d 134, 139 (1972), this Court wrote that although it could "visualize no circumstances where the amount involved in a release or covenant need be disclosed to the jury," whether the simple disclosure of a settlement should be permitted would be left to the discretion of the court. *Degen* approved disclosure of a settlement in order to avert collusion between the parties. Not that *Degen* was wrongly decided in 1972, but it now must be considered in light of the later adoption of the Federal Rules of Evidence in 1978. Today, admission of compromise or settlement evidence is governed by the provisions of SDCL 19–12–10 (Rule 408), which states in part:

> Evidence of … (2) accepting … a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount…. This section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, [or] negativing a contention of undue delay….

[¶ 21.] This rule is designed to encourage out-of-court resolution of disputes. It forbids admission of a settlement or settlement negotiations "to prove liability for or invalidity of the claim or its amount." SDCL 19–12–10 (Rule 408); *Kjerstad*, 517 N.W.2d at 427.

though they were not brought to the attention of the court."

Withholding information or evidence of such a settlement ... from the jury ... (1) focuses the jury on the crucial questions of liability and full compensation, (2) prevents the jury from being confused or misled by its knowledge of the settlement ..., and (3) promotes fair verdicts that are consistent with the evidence presented.

*Holger v. Irish,* 316 Or. 402, 851 P.2d 1122, 1134 (1993) (Unis, J. concurring). In sum, a defendant cannot establish the invalidity of a plaintiff's claim by proof of the plaintiff's settlement with a third person, nor can a plaintiff show a defendant's liability by proof of a defendant's settlement with a third person. *See Cleere v. United Parcel Service,* 669 P.2d 785, 790 (1983) (citations omitted).

[¶ 22.] Compromises may be admissible for "another purpose," however, such as proving the bias or prejudice of a witness, or negativing a contention of undue delay. SDCL 19–12–10 (Rule 408); *see Corn Exchange Bank v. Tri–State Livestock Auction Co., Inc.* 368 N.W.2d 596 (S.D.1985) (if defendant stands to gain financially from plaintiff's verdict by increasing liability of codefendant, jury may be informed of settlement agreement); *Degen,* 200 N.W.2d at 139 (settlement cannot be used for collusive advantage); *Roso v. Henning,* 1997 SD 82, ¶ 13, 566 N.W.2d 136 n3 (S.D.1997) (settlement discussions admitted to show defendant had made an appearance and had not defaulted).

[¶ 23.] As Justice Unis of the Oregon Supreme Court pointed out in interpreting the same rule, "when evidence of a compromise or settlement is offered for 'another purpose,' it must ... satisfy all of the other rules of evidence." *Holger,* 851 P.2d at 1132 (Unis, J. concurring). This is because SDCL 19–12–10 (Rule 408) states that it "does not require exclusion," imply-

ing that other rules of evidence may. To be admissible, evidence of a settlement offered for "another purpose" must be relevant under SDCL 19–12–1 and 19–12–2 (Rules 401 and 402). *Id.* And, considering the reason for which it is offered, if the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, or the other factors listed in SDCL 19–12–3 (Rule 403), the trial court may, in its discretion, exclude the evidence. *Id.*

[¶ 24.] In explaining its reasons for wanting the prior settlement in evidence, Kolcraft's attorney argued to the trial court that the *Degen* decision makes such settlements admissible and that the pleading in the earlier complaint against the landlord was an admission against interest and a prior inconsistent statement. These reasons are insupportable. First, as we pointed out, *Degen* was a pre-federal rules case, and it dealt with the collusive use of a settlement to mislead a jury. Kolcraft does not contend that any collusion was afoot here. Second, whatever merit the remaining contentions have, they disregard the overarching purpose of SDCL 19–12–10 (Rule 408), to make inadmissible such settlements to disprove "liability for or invalidity of the claim or its amount." That impermissible purpose was precisely how Kolcraft wanted to use the settlement: to show that because there had been a previous claim against another tortfeasor (the landlord), the settlement proved the invalidity of the plaintiff's claim against Kolcraft. Rule 408 plainly forbids this. SDCL 19–12–10 (Rule 408). *See also Pounds v. Holy Rosary Medical Center,* 127 Or.App. 221, 872 P.2d 437, 439 n. 3 (1994)(admission of pleadings in settled case would swallow the rule excluding evidence of settlement).

[¶ 25.] Kolcraft believes that if it was error to allow disclosure of the settlement,

the error was not prejudicial: "the jury never got to the issue of damages because it concluded the product was not defective." The verdict form, however, only indicates that the plaintiff "did not prove [the] claim[s]." The jury could have considered the settlement as proof that the settling tortfeasor was the culpable party and that Kolcraft's allegedly defective product was not the proximate cause of the injury. *Holger*, 851 P.2d at 1134 (new trial ordered when judge informed jury of third party settlement and later told jury to disregard it). Thus, even if the jury never reached the issue of damages, improper disclosure of a prior settlement was prejudicial to proving liability. *See Foxworth v. Emanuel Hospital & Health Center*, 131 Or.App. 110, 883 P.2d 917, 917–18 (1994).

[¶ 26.] The trial judge's distinction between disclosure in opening statements and disclosure by formal evidentiary admission ignored the essential purpose of motions *in limine*. These motions seek to preclude any *disclosure*, not simply evidentiary admission. As we said in *Kjerstad*, a motion *in limine* "asks the court to instruct the [party], its counsel and witnesses not to mention certain facts unless and until permission of the court is first obtained outside the presence and hearing of the jury." *Kjerstad*, 517 N.W.2d at 426. In *Kjerstad*, the offending information was conveyed by counsel's questions. *Id.* Trial courts have the duty in jury cases to conduct proceedings, "to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury *by any means*, such as making statements or offers of proof or asking questions in the hearing of the jury." *Id.* (*quoting* SDCL 19–9–5 (Rule 103(c))) (emphasis added).

*See also Brandt v. Wand Partners*, 242 F.3d 6, 20 (1stCir.2001) (applying Rule 408 to disclosure by argument of counsel but finding in that instance that rule had not been violated).

[¶ 27.] Under the facts of this case, the circuit court should have precluded any mention of the prior settlement. Its failure to do so was an abuse of discretion. The jury's duty was to decide whether Kolcraft was liable for Daniel's injuries and, if so, to find damages.[7] Informing the jury of an earlier settlement seriously prejudiced plaintiff's right to a fair trial. A new trial may be granted for "[i]rregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial...." SDCL 15–6–59(a)(1). Plaintiff is entitled to a new trial.

## II.

### Definitions of Defective Condition

[¶ 28.] Plaintiff contends that the trial court's instructions defining defective condition were conflicting and confusing, and thus, they created prejudicial error. The trial court's Instruction 30 defined defective condition:

A product is in a defective condition and unreasonably dangerous to the user if it is not reasonably fit for the ordinary and reasonably foreseeable purposes for which it was sold or manufactured and expected to be used.

A product is in a defective condition unreasonably dangerous to the user if it could have been designed to prevent a foreseeable harm without significantly

---

7. On application of defendant after the verdict, if there had been one in favor of plaintiff, the trial court could reduce the amount of such verdict by the amount of the settlement made by plaintiff with the landlord. Because the court deducts the amount of the settlement from the jury's verdict, there is no need for the jury to have knowledge of the landlord's settlement.

hindering its function or increasing its price.

A product can be dangerous without being unreasonably dangerous. Even if a product is defective in some manner, you must find that the defect renders the product "unreasonably" dangerous. A product is not in a defective or unreasonably dangerous condition merely because it is possible to be injured while using it.

South Dakota Pattern Jury Instructions 150–02–1 and 150–02–2 set forth the defective condition definition and risk/utility test.[8]

[¶ 29.] We agree that the instruction, as given, without further guidance, was confusing. It should have been framed in the disjunctive. It describes two different definitions of a defective condition, but recites them without informing the jury that the plaintiff need only prove one. In fact, the pattern jury instructions from which the court's instruction was taken lists these definitions separately. The court, on its own, decided to combine the instructions, leaving out the disjunctive. This was error. Accordingly, on the errors in allowing disclosure of the prior settlement and in failing to instruct on defective conditions in the disjunctive, the case is reversed and remanded for a new trial.

[¶ 30.] Although we need not reach all of plaintiff's remaining assignments of error, we proceed to decide some of them because they will undoubtedly arise in the next trial.

### III.

### Cigarette Smoking Evidence

[¶ 31.] Plaintiff argues that the trial court erred in permitting the jury to hear

expert testimony about smoking and cigarette disposal in the home as a possible origin of the fire. Peggy Boone smoked a pack and a half of cigarettes a day. Both Peggy and Ken Boone were smoking in the home on the day of the fire. As Kolcraft points out, "Improper disposal of cigarettes was ... a way of life in the Boone household. Photographs showed extensive smoking, overflowing ashtrays, and the improper disposal of cigarettes on windowsills and on floors." Terry Flakus, the Fire Inspector for Sioux Falls, ruled out cigarettes altogether as an ignition source because he could not find any cigarette butts in the children's bedroom after the fire, and the burn characteristics were inconsistent with a cigarette ignition. Thus, plaintiff asserts that no reliable foundation existed from which Kolcraft's expert, Robert Wargin, could state that careless cigarette smoking could have been the cause of the fire.

[¶ 32.] Initially, plaintiff believes that Wargin's analysis was based on the faulty foundation of cigarette smoking. That cigarette smoking could have been the cause of the fire was the *result* of his analysis, not the *foundation* of his analysis. Wargin studied the burn patterns and other evidence and concluded that the point of origin for the fire was not the Playard, but some item within the playpen. Based on this conclusion, he could not rule out cigarette smoking as a cause of the fire. He found that the fire originated inside the playpen. In examining the Playard, he concluded that the playpen pad and fiberboard bottom showed that the fire was from the top down and not from under the playpen. Major fuel material for the fire consisted of pillows, a quilted comfort-

8. Plaintiff contends in its reply brief that "the 'consumer expectation' test is inappropriate in a defective design case." We will not consider an issue first addressed in a reply brief.

er, a blanket, and clothing draped over the playpen. He believed that the urethane foam inside the playpen pad was not responsible for the spread of the fire. Less than thirty percent of both the pad and fiberboard bottom were consumed in the ten-minute fire. Finally, he deduced, through "process of elimination, the dropping of a cigarette or knocking off of cigarette ash when Daniel was placed in the Playard is the most likely cause of the fire." In sum, Wargin declined to begin and end his analysis on Inspector Flakus's premise that cigarette smoking was not the cause. Wargin was free to do so, and Kolcraft was free to present his opinion because there were sufficient facts to support it. SDCL 19–15–3 (Rule 703).

■■■■ [¶ 33.] Plaintiff next contends that Wargin's testimony did not suffice to prove proximate cause. Plaintiff, not Kolcraft, had the burden of proving proximate cause. Wargin's testimony was offered to refute plaintiff's claim that the Playard was the source of the fire. Under the *Daubert* analysis, could Wargin have properly based his opinion on evidence of smoking in the Boone apartment? *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the question was whether a *plaintiff's* expert could testify when the methodology used was not generally accepted. *Id.* The *Daubert* Court reasoned that "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* at 590, 113 S.Ct. 2786. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786. As part of its rationale for accepting expert scientific opinion not based on generally accepted methodology, the Court stated that "vigorous cross-exami-

nation, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 595–96, 113 S.Ct. 2786. The Court further reasoned, "These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standard of Rule 702 [SDCL 19–15–2]." *Id.* Wargin's testimony fits squarely within the Supreme Court's "traditional and appropriate means" of assailing plaintiff's expert testimony.

[¶ 34.] Plaintiff would seemingly have us declare that one expert's opinion is invulnerable. Plaintiff argues that because other experts did not draw a definitive conclusion about the origin of the fire, one defense expert must be precluded from testifying on other causes of the fire. By his own testimony, Inspector Flakus must have initially considered the possibility of a cigarette causing the fire. He conducted a layer search of the burned area. During this search he attempted to locate possible causes. He stated that he did not find a cigarette butt; therefore, he believed careless cigarette disposal did not start the fire. Wargin did not stop with that hypothesis. He did not have the benefit of searching the area immediately after the fire. However, this does not mean that he had to accept all of Inspector Flakus's conclusions based on that search. He was free to use his expertise to reach his own conclusions. To Wargin, the absence of a cigarette butt only proved that a cigarette butt was not found.

[¶ 35.] Plaintiff argues that SDCL 19–15–3 precluded Wargin's opinions from being introduced because his opinions were too remote from the known facts. SDCL 19–15–3 (Rule 703) provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The *Daubert* Court explained Rule 703: "Expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" 509 U.S. at 595, 113 S.Ct. at 2797–98.

[¶ 36.] Here, the statute allowed Wargin to base his opinion on the fact that the Boones smoked, whether their smoking habits were admissible as evidence or were inadmissible hearsay. The only qualification is that the fact must be reasonably relied upon by other experts in the field. Surely, the fact that the residents of the apartment smoked is a reasonable basis from which to infer that smoking *may* have caused a fire. This inference is no less reasonable than an inference drawn by Flakus that smoking *could not* have caused the fire because there was no evidence of smoking in a particular room despite evidence of smoking everywhere else in the apartment.

[¶ 37.] Plaintiff states that "[n]either Wargin nor Flakus nor Kennedy asserted that other experts in the field relied upon these kinds of facts." On its face, the contention that Wargin could not base his opinions on the fact that the Boones smoked defies common sense.[9] Because these experts did not testify on the subject does not suggest that an expert could not rely on such facts. In sum, Wargin's opinion was not remote from the known facts.

[¶ 38.] Plaintiff misconstrues our holding in *First Western Bank Wall v. Olsen*, 2001 SD 16, 621 N.W.2d 611. Plaintiff portrays our holding as "the *threshold* for admissibility of the appraiser's opinions was his use of reliable facts and data in evidence, his adherence to generally accepted valuation principles and his use of an accepted scientific method of valuation." (Emphasis added.) Our holding in that case announced no such threshold. The actual holding of *First Western Bank Wall* states, "After reviewing [the] expert testimony, it is clear that [the] opinions as to valuation were relevant and based on generally accepted valuation principles. Use of these generally accepted principles is *sufficient* to establish admissibility under *Kumho* and *Daubert*." 2001 SD 16, ¶ 10, 621 N.W.2d at 616 (emphasis added).

[¶ 39.] We agree with plaintiff's assertion that the situation here is almost identical to that in *Weisgram v. Marley Co.*, 169 F.3d 514 (8thCir.1999). In *Weisgram*, a fire investigator testified that:

[H]e had considered whether careless smoking might have started the fire in the sofa, but he rejected that possibility *because he saw no smoking materials in the home* and because he did not think the burn pattern in the sofa indicated that the fire began as the result of careless smoking.

*Id.* at 518 (emphasis added). Instead, the investigator believed that a faulty base-

9. Plaintiff refers to NFPA 921. According to plaintiff, "Without 'positive evidence' of smoking, NFPA 921 prohibits a fire analyst from speculating on 'possible or suspected' causes after listing the cause as 'undetermined', which was the faulty methodology Wargin used." (Internal citations omitted.) Plaintiff does not state the meaning of "positive evidence" as defined by NFPA 921. We presume that the evidence of smoking within the Boone home suffices to meet that definition and therefore reject plaintiff's argument.

board heater caused the fire. *Id.* The defense, however, posed a different theory. Their experts reasoned, "At some time that night, [the occupant] dropped a lighted cigarette behind a cushion of the sofa, which eventually started a smoldering fire." *Id.* at n. 4. The only evidence of cigarette smoking was the testimony of a witness who had seen the deceased "drink an alcoholic beverage and smoke a cigarette before he left." *Id.* at 516. While the court did not adopt the defense version of events, the scenario advanced by the defense was permitted to stand. *Id.* at n. 4. In comparing *Weisgram* with our case, we ·find substantial similarities. In both cases, the defense proposed theories that the fire might have been started by careless cigarette smoking. In neither case did the fire investigator find evidence of careless cigarette smoking in the area of the fire. However, there is at least one difference worthy of note. In *Weisgram*, the inspector failed to find any evidence of smoking in the *home*. Here, there was ample evidence and testimony that cigarette smoking was occurring in the home.

## IV.

### Spoliation of Evidence

[¶ 40.] Plaintiff asks whether the trial court erred in permitting a spoliation instruction that allowed the jury to draw an adverse inference based on the loss, by plaintiff, of two pieces of evidence. "Under our standard of review, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law." *State v. Frazier*, 2001 SD 19, ¶ 35, 622 N.W.2d 246, 259 (citations omitted). If, as a whole, the instructions misled, conflicted, or confused, then reversible error occurred. *State v. Moschell*, 2004 SD 35, ¶ 54, 677 N.W.2d 551, 567 (citations omitted). The party charging that an instruction was given in error has

the dual burden of showing that the instruction was erroneous and prejudicial. *Id.* An erroneous instruction is prejudicial if in all probability it produced some effect upon the verdict and is harmful to the substantial rights of the party assigning it. *Carpenter v. City of Belle Fourche*, 2000 SD 55, 609 N.W.2d 751. As we explained in *Carpenter*, our rule on harmless error is found in SDCL 15–6–61:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

[¶ 41.] We conclude that the court should not have given the instruction. There was no showing that the evidence was unavailable because of bad faith or intentional conduct on the part of plaintiff or someone acting on plaintiff's behalf. In fact, a defense expert examined the missing evidence before it disappeared and defense experts had photographs available to use in place of the actual evidence.

[¶ 42.] In *State v. Engesser*, 2003 SD 47, 661 N.W.2d 739, decided a year after the trial in this case, we covered how a court should determine when a spoliation instruction is warranted. Generally, such an instruction should not be given unless there is evidence that the missing material was disposed of intentionally or in bad faith. There was no evidence of that here.

## V.

### Mother's Statement to Medical Providers

[¶ 43.] Plaintiff argues that the trial court erred by refusing to give a limiting instruction on the use of prior inconsistent statements and improperly allowed Kolcraft to use the statement as substantive evidence. In her direct examination, Peggy Boone stated that she did not actually see the fire in the bedroom and did not know how it started. On cross examination, however, she was asked:

Q: Mrs. Boone have you ever told anyone how you think the fire started?

A: Yes, I have.

Q: What have you told people about how you think the fire started?

A: I thought a blanket must have started on fire.

Q: Who did you tell that to?

A: I believe someone at Shriner's Hospital and maybe John Sivesind.

Her original statement to this effect was apparently recorded on a hospital record. Kolcraft was aware of the statement made by Peggy and wanted to use it to impeach her testimony. After a hearing, Kolcraft agreed that it would ask only three questions as framed and drafted by plaintiff's counsel. Nonetheless, plaintiff interposed a timely objection to this line of questioning.

[¶ 44.] Plaintiff contends that Peggy's statements were not admissible as extrinsic evidence of a prior inconsistent statement under SDCL 19–14–25 (Rule 613(b)) or an exception to the hearsay rule under SDCL 19–16–32 (Rule 804(b)(3)) (statement against interest). Assuming for argument's sake that this evidence is hearsay, we conclude that it falls within the medical records exception. "State-

ments made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment [are admissible evidence]." SDCL 19–16–8 (Rule 803(4)). Such statements need not refer only to a declarant's physical condition. 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE P 803(4)[01] 1988. Statements made for purposes of diagnosis or treatment relating to someone else may also be admissible: "The relationship between declarant and patient will usually determine admissibility." *Id.* In the case of a child, statements made by parents and guardians on the child's behalf are assumed reliable and thus are admissible. *Id.*

## VI.

### Subsequent Remedial Measures

[¶ 45.] To show that the product was defective at the time Daniel was burned in 1992, plaintiff offered evidence that Kolcraft began using fire retardant treated foam in all its Playard pads in 1993 or 1994.[10] The trial court disallowed this evidence on the ground that it would cause "undue delay" under SDCL 19–12–3 (Rule 403). Plaintiff believes that the trial court abused its discretion in excluding evidence of these remedial measures. To plaintiff, this type of evidence is "highly probative" and should only be excluded under narrow circumstances not present here. SDCL 19–12–9 (Rule 407) provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or

10. Peggy purchased the Playard in 1991 at the Half Price Store in Sioux Falls.

culpable conduct in connection with the event. This section does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

[¶ 46.] In sum, the general rule is that subsequent remedial measures are not admissible as evidence. This Court has nonetheless allowed evidence of subsequent remedial measures in strict products liability actions. *Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251, 257 n. 7 (S.D.1976) (drawing distinction between negligence actions and strict liability actions). A pre-federal rules case, *Shaffer* deduced that while proof of such measures is not permitted in negligence actions, post-accident safety measures are admissible as evidence in strict liability cases. The issue arose again after the Federal Rules of Evidence had been adopted in South Dakota. Yet, without even mentioning Rule 407, the Court in *Klug v. Keller Industries, Inc.* 328 N.W.2d 847, 852 (S.D.1982), reaffirmed the *Shaffer* rationale, finding "no compelling reason" to alter its prior holding.

[¶ 47.] Since *Shaffer* and *Klug,* the force of authority has swung decidedly against admitting subsequent remedial measures in strict products liability actions.[11] There are two reasons for this. In 1997, Congress amended FRE 407 specifically to clarify that strict liability actions are included in its prohibition.[12] The pertinent part of the amended version now provides that "evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, *a defect in a product, a defect in a product's design, or a need for a warning or instruction."* See FRE 407 as amended (new language in italics). South Dakota never adopted the 1997 amendment and that would perhaps end our analysis but for the fact that this Court has never interpreted SDCL 19–12–9 (Rule 407) in this type of case. *Cf. Bland v. Davison County,* 1997 SD 92, ¶¶ 18–24, 566 N.W.2d 452, 458–60 (examining the rule's impeachment exception).

[¶ 48.] Long before the 1997 amendment, however, most federal courts, in interpreting Rule 407 as originally drafted, had come to the conclusion that admitting evidence of subsequent remedial measures in strict products liability cases while excluding it in negligence actions inserts an unwarranted breach in the rule through which "extremely damaging" and "highly prejudicial" evidence can enter. *Cann v. Ford Motor Co.,* 658 F.2d 54, 60 (2dCir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982) (citations omitted). *See Wood v. Morbark Indus., Inc.,* 70 F.3d 1201, 1206–07 (11thCir.1995); *In re Joint E. Dist. and S. Dist. Asbestos Litig. v. Armstrong World Indus., Inc.,* 995 F.2d 343 (2dCir.1993); *Kelly v. Crown Equip. Co.,* 970 F.2d 1273, 1275–76 (3dCir.1992); *Raymond,* 938 F.2d at 1522–23; *Gauthier v. AMF, Inc.,* 788 F.2d 634, 636–37, *amended,* 805 F.2d 337 (9thCir.1986); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 468–72 (7thCir.1984);

---

**11.** For an early law review article foreseeing the coming changes based on Rule 407, see Barbara Strong Goss, SUBSEQUENT REMEDIAL MEASURES IN STRICT LIABILITY: LATER OPINIONS AS EVIDENCE OF DEFECTS IN EARLIER REASONING, 32, Cath. U.L.Rev. 895 (1983).

**12.** According to the Advisory Committee notes, Rule 407 has been amended to provide that evidence of subsequent remedial measures may not be used to prove "a defect in a product or its design, or that a warning or instruction should have accompanied a product. This amendment adopts the view of a majority of the circuits that have interpreted Rule 407 to apply to products liability actions."

Grenada Steel Indus., Inc. v. Alabama Oxygen Co., 695 F.2d 883, 888 (5thCir.1983); Hall v. American S.S. Co., 688 F.2d 1062, 1066–67 (6thCir.1982); Werner v. Upjohn Co., 628 F.2d 848, 858 (4thCir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981); Bauman v. Volkswagenwerk Aktiengesellschaft, 621 F.2d 230, 232 (6thCir.1980). Only the Eighth and Tenth Circuits followed a contrary interpretation before the 1997 amendment. See Burke v. Deere & Co., 6 F.3d 497, 506 (8thCir.1993) cert. denied, 510 U.S. 1115, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994) (superceded by FRE 407, as amended); Huffman v. Caterpillar Tractor Co., 908 F.2d 1470, 1480–81 (10thCir.1990) (same); Robbins v. Farmers Union Grain Terminal Association, 552 F.2d 788, 793 (8thCir.1977) (applying South Dakota law and quoting Shaffer ).

[¶ 49.] Likewise, those states adopting some form of FRE 407 also paralleled federal jurisprudence, interpreting their rules to exclude subsequent remedial measures in both negligence and strict products liability cases. See, e.g., Hyjek v. Anthony Indus., 133 Wash.2d 414, 944 P.2d 1036, 1039, 1042–43 & nn. 6–7 (1997) (citing cases); Cyr v. J.I. Case Co., 139 N.H. 193, 652 A.2d 685, 693 (1994); Krause v. American Aerolights, Inc., 307 Or. 52, 762 P.2d 1011, 1013 (1988); Kallio v. Ford Motor Co., 407 N.W.2d 92, 97–98 (Minn.1987); Rix v. Gen. Motors Corp., 222 Mont. 318, 723 P.2d 195, 202 (1986); Hallmark v. Allied Prod. Corp., 132 Ariz. 434, 646 P.2d 319, 325–26 (1982). See generally Annotation, Admissibility of Evidence of Subsequent Repairs or Other Remedial Measures in Products Liability Cases, 74 A.L.R.3d 1001.

■ [¶ 50.] Rule 407 was designed to ensure that the threat of legal liability would not discourage remedial measures to improve products. Thus, the rule seeks to motivate manufacturers to make improvements without fearing the legal ramifications of their remedial acts. The rule accomplishes this by removing the threat that product improvements will be used as evidence against manufacturers. Duchess v. Langston Corp., 564 Pa. 529, 769 A.2d 1131, 1143 (2001) (continual process of improvement and innovation in the marketplace favors broader application of evidentiary exclusion). This purpose would seem to apply equally to negligence and strict liability actions, so we find it difficult to comprehend why the public policy behind Rule 407 should be construed differently in cases based on strict liability. From the viewpoint of manufacturers, it is the fact that the evidence will be used against them that inhibits subsequent repairs or improvements. For them, what difference does it make under which theory the evidence might be admitted? Werner v. Upjohn Co., 628 F.2d 848, 857 (4thCir.1980).

[¶ 51.] As Judge Posner explained in Flaminio, the attempted distinction between negligence and strict liability in relation to Rule 407 is "purely semantic." 733 F.2d at 469.

The analysis is not fundamentally affected by whether the basis of liability is the defendant's negligence or his product's defectiveness or inherent dangerousness. In either case, if evidence of subsequent remedial measures is admissible to prove liability, the incentive to take such measures will be reduced.

Id. (citing Birchfield v. Int'l Harvester Co., 726 F.2d 1131, 1139 (6thCir.1984)) (citations omitted).

■ [¶ 52.] Introducing evidence of subsequent remedial measures tends to divert the jury's attention from whether the product was defective at the time it was manufactured and sold to some later time. South Dakota's statutory language governing products liability supports the conclu-

sion that SDCL 19–12–9 (Rule 407) applies to strict products liability actions. The point of time for assessing liability for the defective product in question is the time the product was "first sold." SDCL 20–9–10.1.[13] If the time of product sale is the point for deciding liability in strict liability cases, then product knowledge acquired after that point becomes irrelevant. *Hyjek*, 944 P.2d at 1042–43.

[¶ 53.] We find the distinction conceived in *Shaffer* and *Klug* between negligence and strict liability to be indiscernible in relation to Rule 407 and overrule those two cases to the extent that they hold to the contrary. The general prohibition against admitting evidence of subsequent remedial measures embodied in SDCL 19–12–9 (Rule 407) precludes use of subsequent design changes as substantive evidence of a product defect in a strict products liability case.

[¶ 54.] Although not arguing that any relevant exception to Rule 407 applies, plaintiff contends that probative value is not in question here because the trial court refused to admit the evidence based on undue delay of the proceedings. We think policy considerations in Rule 407 favor the general rule of exclusion, but we cannot say, in view of the state of the law at the time of trial, that it was an abuse of discretion to invoke the "undue delay" language in Rule 403 to preclude this evidence. Certainly, lack of sufficient probative value or unfair prejudice can be advanced as independent grounds for the general exclu-

sion of subsequent remedial evidence under Rule 403. *Luda Foster v. Ford Motor Co.,* 621 F.2d 715, 721 (5thCir.1980); FRE 407 advisory committee note. We find no abuse of discretion.

## VII.

### Nonfunctioning Smoke Detector

[¶ 55.] At the time Daniel was burned, an ionizing smoke detector was in the hallway outside his bedroom, but it had no batteries. Plaintiff argues that the trial court abused its discretion by allowing Kolcraft to present evidence of this nonfunctioning smoke detector in the Boone apartment. "Proof of causation," plaintiff contends, "*or lack thereof,* must be based on the evidence in the record, and not 'mere suggestion' or 'speculation.'" (Emphasis added.) Plaintiff cites *Engberg v. Ford Motor Co.,* 87 S.D. 196, 202, 205 N.W.2d 104, 107 (1973) and *Klein v. W. Hodgman & Sons, Inc.,* 77 S.D. 64, 68, 85 N.W.2d 289, 292 (1957) as standing for this proposition. These cases did not pass the burden of proving causation onto the defense. A proper reading of *Engberg* and *Klein* reveals only that "mere suggestion" or "speculation" on the part of the defense is not enough to prevent a jury from performing its duty as the finder of fact.

[¶ 56.] In *Engberg,* we held that plaintiffs meet their burden of proof on causation when the evidence is sufficient for the jury to conclude, without speculation, that the preponderance of the evidence favors liability. *Engberg,* 87 S.D. at 202, 205

---

**13.** SDCL 20–9–10.1 provides:

**Product liability—Action on negligence or strict liability—Standard of care—Consideration of conformity at time of manufacture.**

In any product liability action based upon negligence or strict liability, whether the design, manufacture, inspection, testing, packaging, warning, or labeling was in conformity with the generally recognized and prevailing state of the art existing *at the time the specific product involved was first sold* to any person not engaged in the business of selling such a product, *may be considered* in determining the standard of care, whether the standard of care was breached or whether the product was in a defective condition or unreasonably dangerous to the user. (Emphasis supplied.)

N.W.2d at 107. "We find [no] merit in the defendant's argument that the mere suggestion of other causes of the decedent's death made the plaintiff's theory of causation a matter of speculation." *Id.* In *Klein,* we reasoned that the "mere suggestions" of other possible causes did not preclude the trial court from submitting the issue of causation to the jury:

Plaintiff had the burden, not only of proving that defendant was responsible for some negligent act, but that such act was the proximate cause of her injury and damage. .... We agree with the Circuit Court of Appeals for the Eighth Circuit that "A theory of proximate cause resting in probative circumstances does not become a matter of *speculation* and conjecture by a *mere suggestion* of other possible causes which are unsupported by any proved facts." The evidence as to the proximate cause of the accident presented a question of fact to be resolved by the jury.

*Klein,* 77 S.D. at 67–68, 85 N.W.2d at 291–92 (internal citations omitted) (emphasis added).

[¶ 57.] Plaintiff next argues that because contributory negligence is not a permissible defense to a strict liability action, the purpose of testimony regarding the smoke detector was to discredit Peggy Boone. Plaintiff further argues that no amount of remediation by the trial court could lessen the prejudicial effect of this evidence.

[¶ 58.] Directly after testimony concerning the smoke detector, the trial court directed the jury's attention to Preliminary Instruction 9. The trial court then read the instruction:

You are instructed that evidence about the smoke detector in the Boone apartment is being received solely on the issue of whether an earlier warning of the fire may have reduced or prevented

the plaintiff's injuries, Daniel Boone's injuries. You shall not consider this evidence for any other purpose. The conduct of the plaintiff or his parents is not a defense to the plaintiff's strict liability claim.

In addition to this instruction, Instruction 36, entitled, "Contributory Negligence Is No Defense," was given to the jury. The instruction states, "The contributory negligence of plaintiff or of his parents, if any, is not a defense to plaintiff's strict liability claim." We presume that juries will follow the court's instructions. *Hossle v. Fountain,* 1999 SD 104, ¶ 9, 598 N.W.2d 877, 879. In these circumstances, the court did not err in allowing this testimony.

## VIII.

### Proximate Cause

[¶ 59.] Lastly, we address Kolcraft's notice of review question on its claim that proof of proximate cause was lacking as a matter of law. In trial, plaintiff alleged that (1) California law requires that all upholstered furniture sold in the state be fire resistant; (2) Kolcraft manufactured its Playard with vinyl pads containing fire retardant treated foam for sale in California at the same time that it manufactured the same Playard pads containing untreated foam for sale in other states; and (3) untreated foam ignites easier and burns at a more rapid rate than treated foam. Kolcraft argues that all the evidence presented at trial, including the tests performed by plaintiff's own experts, proved that the pads, as covered by thin vinyl, burned the same way regardless of whether they contained treated or untreated foam. If treated and untreated pads burn the same, Kolcraft reasons, then use of an untreated pad could not have proximately caused the child's injuries. Kolcraft also asserts the evidence was legally insufficient to support a finding that failure to warn proximately caused the child's inju-

ries: because both treated and untreated Playard pads burn the same way, they are equally safe and therefore Kolcraft had no duty to warn.

▋ [¶ 60.] Kolcraft moved for summary judgment before trial and a directed verdict at the end of trial, arguing that as a matter of law plaintiff could not prove the Playard proximately caused Daniel's injuries. Both motions were denied. We think it advisable to review only the directed verdict decision because a ruling under SDCL 15–6–50 is based on the full trial record, not the limited pretrial record available at the time of the summary judgment decision. Motions for directed verdict under SDCL 15–6–50(a) test whether sufficient evidence was produced to meet the legal threshold necessary to sustain the action. *Schuldies,* 1996 SD 120, ¶ 8, 555 N.W.2d at 94 (citations omitted). Without weighing the evidence or considering questions of credibility, all evidence with its reasonable inferences must be viewed in a light most favorable to the nonmoving party. *Id.* If there is sufficient evidence adverse to the motion such that reasonable jurors might reach a different result, then the motion must be denied. *Id.* On review, we will reverse the circuit court only if reasonable minds could come to no conclusion other than one favoring the movant. *Id.* Rulings on such motions are presumed correct and we will not seek reasons to reverse. *Id.*

[¶ 61.] Flakus, one of the experts called by plaintiff, theorized that the masonite floorboard in the playpen sustained thermal degradation because of its long proximity to a hot water baseboard heater in the children's bedroom. The playpen had been pushed against this heater and it had been turned on high for a long time. This caused "pyrolytic ignition." Nonetheless, plaintiff argued that the source of ignition was immaterial because if the playpen had been constructed with fire retardant mate-

rials, the child would not have been injured. If flame retardant foam had been used, as in California, plaintiff's experts thought the fire would have been suppressed. Defense experts opined that the playpen itself did not ignite initially, but that something (cigarette) first ignited the bedding in the playpen. Bunsen burner flame tests indicated that with their vinyl covering the playpen pads did not remain ignited once the flame was removed, regardless of whether the pads contained treated or untreated foam. Yet, these tests did not attempt to duplicate the conditions in the child's bedroom at the time of the fire.

▋ [¶ 62.] Proximate or legal cause is a cause that produces a result in a natural and probable sequence and without which the result would not have occurred. Such cause need not be the only cause of a result. It may act in combination with other causes to produce a result. SDCL 21–3–1; *Estate of Gaspar,* 2003 SD 126, ¶ 6, 670 N.W.2d 918, 921. Causation is almost always a fact question, "except when there are no differences of opinion on the interpretation of the facts." *Id.* at ¶ 5, 670 N.W.2d 918. In examining the evidence in a light most favorable to plaintiff, we think reasonable minds could differ on the proper outcome. Jurors were required to weigh conflicting opinions between several experts and find whether the facts supported one opinion over another. The circuit court properly denied Kolcraft's motion for directed verdict.

[¶ 63.] Affirmed in part, reversed in part, and remanded for a new trial.

[¶ 64.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.